Nos. 2016-1085, -1160

# United States Court Of Appeals
# for the Federal Circuit

ALLERGAN, INC.,
*Plaintiff-Appellant,*

DUKE UNIVERSITY,
*Plaintiff,*

v.

SANDOZ, INC., AKORN, INC., HI-TECH PHARMCAL CO., INC., APOTEX INC.,
APOTEX CORP.,
*Defendants-Appellees,*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH
CAROLINA IN NOS. 1:14-CV-01034-CCE-LPA AND 1:14-CV-01028-CCE-LPA,
JUDGE CATHERINE C. EAGLES.

## APPELLANT'S OPENING BRIEF

Jonathan E. Singer
Deanna J. Reichel
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
(617) 542-5070

Elizabeth M. Flanagan
Fish & Richardson P.C.
222 Delaware Avenue
17th Floor
P.O. Box 1114
Wilmington, DE 19899
(302) 652-0570

March 25, 2016

CERTIFICATE OF INTEREST

1.    The full name of every party represented by me is:  Allergan, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  Allergan, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  Allergan plc is the ultimate parent of Allergan, Inc.  No publicly traded company other than Allergan plc owns 10% or more of Allergan, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

> Fish & Richardson P.C.:  Jonathan E. Singer, Juanita Brooks, Douglas McCann, Deanna Reichel, and Elizabeth Flanagan

> The Van Winkle Law Firm:  Larry McDevitt, David Wilkerson, and Heather Whitaker Goldstein

Dated:  March 25, 2016                    */s/ Deanna J. Reichel*
                                           Deanna J. Reichel

# TABLE OF CONTENTS

**Page**

Certificate of Interest .................................................................... i

Statement of Related Cases ........................................................ vi

Statement of Jurisdiction........................................................... vii

Statement of the Issues ............................................................. viii

Introduction ................................................................................. 1

Statement of the Facts ................................................................. 2

I.    The Parties' Prior Litigations over Patents to Eyelash
      Growth............................................................................... 2

      A.    The First Suit:  the '404 Patent Claims Related
            to Methods of Enhancing Eyelash Growth, Not
            Increasing Darkness. ............................................... 2

      B.    The Second Suit:  the '054, '161, and '988
            Patents Also Related to Methods of Enhancing
            Eyelash Growth........................................................ 5

II.   The Present Litigation:  the District Court Invokes
      Collateral Estoppel, Even Though the Asserted
      Claims of the '953 Patent Cover Only Increasing
      Eyelash "Darkness." ......................................................... 6

      A.    The Asserted Claims of the '953 Patent Are
            Directed to Increasing Eyelash Darkness..................... 6

      B.    The District Court Dismisses These Suits Based
            on Collateral Estoppel............................................ 8

Summary of the Argument .......................................................... 12

Legal Standards .......................................................................... 13

Argument ..................................................................................... 14

## TABLE OF CONTENTS (CONTINUED)

**Page**

I.  The District Court's Invalidity Judgment Based on
Collateral Estoppel Should Be Reversed. ..................................... 14

    A.  The Eyelash Darkness Claims Here Present a
Different Issue than the Eyelash Growth Claims
that Was Previously Decided. ............................................ 14

        1.  The Obviousness of Using Bimatoprost
to Darken Eyelashes Was Not Decided in
the Prior Cases. ............................................................ 14

        2.  The District Court's Reasons for Finding
the Issue Here Identical to Prior Cases
Are All Unpersuasive. ............................................... 19

    B.  Allergan Didn't Previously Have a Full and
Fair Opportunity to Litigate the Validity of
Claims to "Increasing Eyelash Darkness." ...................... 22

II.  The District Court Erroneously Invalidated
Unasserted Claims of the '953 Patent. ......................................... 26

Conclusion ............................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adcock v. Freightliner LLC,*
  550 F.3d 369 (4th Cir. 2008) ............................................................13

*Allergan, Inc. v. Apotex Inc.,*
  754 F.3d 952 (Fed. Cir. 2014) ...................................................*passim*

*Applied Materials, Inc. v. Gemini Research Corp.,*
  835 F.2d 279 (Fed. Cir. 1987) .........................................................19

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
  672 F.3d 1335 (Fed. Cir. 2012) .......................................................13

*CIR v. Sunnen,*
  333 U.S. 591 (1948) ........................................................................25

*Comair Rotron, Inc. v. Nippon Densan Corp.,*
  49 F.3d 1535 (Fed. Cir. 1995) .........................................................19

*Dana Corp. v. NOK, Inc.,*
  882 F.2d 505 (Fed. Cir. 1989) .........................................................23

*In re Freeman,*
  30 F.3d 1459 (Fed. Cir. 1994) .........................................................22

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966) ......................................................................14, 15

*Interconnect Planning Corp. v. Feil,*
  774 F.2d 1132 (Fed. Cir. 1985) .......................................................14

*Jervis B. Webb Co. v. S. Sys., Inc.,*
  742 F.2d 1388 (Fed. Cir. 1984) .......................................................26

*In re Katz,*
  687 F.2d 450 (C.C.P.A. 1982) ...............................................3, 23, 24

*Ohio Willow Wood Co. v. Alps South, LLC,*
  735 F.3d 1333 (Fed. Cir. 2013) .......................................................13

*Sedlack v. Braswell Servs. Group, Inc.*,
134 F.3d 219 (4th Cir. 1998) ..............................................................13

*SunTiger, Inc. v. Scientific Research Funding Group*,
189 F.3d 1327 (Fed. Cir. 1999) ..........................................................19

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
731 F.3d 1336 (Fed. Cir. 2013) ..........................................................13

## Statutes

28 U.S.C. § 1295(a)(1).................................................................... vii

35 U.S.C. § 102(a) ....................................................................23, 24

35 U.S.C. § 103 .................................................................. vi, 26, 27

## Other Authorities

Fed. R. App. P. 4(a)(1)................................................................. vii

Fed. R. Civ. P. 12(b)(6).......................................................... vii, 9, 13

RESTATEMENT (SECOND) OF JUDGMENTS § 27 ......................................22

RESTATEMENT (SECOND) OF JUDGMENTS § 28(2)(b)...............................25

## STATEMENT OF RELATED CASES

These consolidated appeals involve two district court cases, one against Apotex Corp. and Apotex, Inc. (Case No. 14-cv-1028), and the other again Sandoz, Inc., Hi-Tech Pharmacal Co., Inc., and Akorn, Inc. (Case No. 14-cv-1034), for infringement of U.S. Patent No. 8,926,953. There have been no prior appeals in these cases. However, the '953 patent is related to U.S. Patent No. 7,351,404, and the '404 patent was the subject of a prior case in which a panel of this Court, consisting of Chief Judge Prost, Judge Reyna, and Judge Chen, held the asserted '404 patent claims obvious under 35 U.S.C. § 103. *See Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952 (Appeal Nos. 2013-1245, -1246, -1247, -1249) (Fed. Cir. 2014). Chief Judge Prost wrote the opinion, while Judge Chen dissented in part (on a different patent).

There are no other currently pending cases known to counsel that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The district court entered its final judgment dismissing Case No. 14-cv-1028 under Fed. R. Civ. P. 12(b)(6) and invalidating claims 8, 23, and 26 of the '953 patent on September 28, 2015.  (A7.)  Allergan timely filed its notice of appeal on October 16, 2015, within the 30-day period set by Fed. R. App. P. 4(a)(1).  (A1342-44.)  This court thus has jurisdiction under 28 U.S.C. § 1295(a)(1).

The district court entered its order and judgment dismissing Case No. 14-cv-1034 under Fed. R. Civ. P. 12(b)(6) and that seemed to invalidate all claims of the '953 patent on August 31, 2015.  (A8-9; A10-11.)  The court then entered a "final judgment" in the case on September 29, 2015, that referenced Akorn and Hi-Tech, invalidating only claims 8, 23, and 26 of the '953 patent.  (A12-13.)  Allergan timely filed its notice of appeal on September 30, 2015, within the 30-day period set by Fed. R. App. P. 4(a)(1).  (A2626-28.)  This Court thus has jurisdiction under 28 U.S.C. § 1295(a)(1).

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the district court erred in dismissing claims 8, 23, and 26 of the '953 patent based on collateral estoppel when the asserted claims are limited to increasing eyelash darkness, an issue not addressed in the prior cases, which dealt only with eyelash growth.

2.      Whether, at a minimum, the district court erred in declaring the entire '953 patent invalid, including claims that were not asserted in this case and over which the court thus had no subject matter jurisdiction.

# INTRODUCTION

These appeals involve a misapplication of collateral estoppel to short-circuit Allergan's ability to assert newly issued patent claims that are patentably distinct from its earlier patents. Allergan's Latisse® is the only FDA-approved product for increasing the length, thickness, and darkness of eyelashes. Allergan's initial patents on Latisse claimed using its active ingredient to increase eyelash growth, but this Court invalidated one as obvious in a prior suit, prompting the district court to invalidate others in a follow-on suit based on collateral estoppel. This Court's decision focused on a disclosure in an Allergan prior publication about eyelash growth and found the publication was prior art because there was insufficient evidence that Allergan's inventor had directed its experiments.

Accepting this Court's determination, Allergan secured a continuation patent on a different aspect of Latisse—using it to increase eyelash darkness. The prior publication was silent about eyelash darkness, and Allergan submitted new evidence establishing that the prior publication in any event was an inventor's own work, entirely removing it as prior art. The Patent Office considered this evidence, along with this Court's opinion in the prior case, and allowed the new claims.

The district court nevertheless dismissed this suit at the pleadings stage based on collateral estoppel. But the claims here present unique validity issues, as the PTO's decision demonstrates. The judgment should thus be reversed.

<u>STATEMENT OF THE FACTS</u>

I.    **The Parties' Prior Litigations over Patents to Eyelash Growth.**

A.    **The First Suit:  the '404 Patent Claims Related to Methods of Enhancing Eyelash Growth, Not Increasing Darkness.**

This is the third round of patent litigation over Defendants' attempt to sell a generic version of Allergan's Latisse®, an FDA-approved product for increasing eyelash length, thickness, and darkness.  (A2993.)  In the first round, Allergan asserted that Defendants' proposed generic products infringed claim 14 of U.S. Patent No. 7,351,404, which claims "a method for stimulating hair growth" by applying "an effective amount" of a class of compounds that includes bimatoprost (the active ingredient in Latisse) to the skin.  The district court construed those terms to require only hair growth:

> <u>an effective amount</u>: "a dose sufficient to stimulate hair growth over time with repeated applications."

> <u>a method for stimulating hair growth</u>: "a method of converting vellus or intermediate hair to growth as terminal hair, increasing the rate of hair growth, increasing the number of anagen hairs, decreasing the number of telogen hairs, preventing atrophy of hair follicles, stimulating the growth of vellus hair to terminal hair on the skin, or increasing the length, number or thickness of hair."

(A3069-70; A3072-73.)  Neither construction says anything about increasing the darkness of eyelashes, which is unsurprising given that the claims themselves refer only to stimulating hair growth.

Given the claim language and the court's constructions, the parties' validity

arguments all focused on hair growth, not darkness. The defendants argued that the '404 claims were obvious based (1) the Johnstone PCT application (WO 98/33497), which reported that a different molecule (latanoprost) stimulated hair growth, and (2) the Brandt references, which were a collection of reports from clinical trials where bimatoprost was used to treat glaucoma that reported eyelash growth as a side effect. (A3436.) The district court rejected this argument, finding that several of the Brandt references were not prior art because Allergan established an earlier invention date, while the remaining Brandt references did not actually mention bimatoprost. (*Id.*)

This Court subsequently reversed, determining that the asserted '404 claims were obvious based on the combination of the Johnstone PCT and the Brandt references. *See Allergan, Inc. v. Apotex, Inc.*, 754 F.3d 952, 966-70 (Fed. Cir. 2014). The Court first determined that the Brandt references were all prior art, because it found that there was insufficient corroboration of an earlier invention date. *Id.* at 967-68. The Court also held that there was insufficient evidence that the Brandt references were the inventors' own work, which would have removed them as prior art under *In re Katz*, 687 F.2d 450 (C.C.P.A. 1982), even though they reported results from clinical trials that had been organized and run by inventor Dr. Amanda VanDenburgh. *Allergan*, 754 F.3d at 968-70. The Court then observed that the Johnstone PCT "details at length how eyedrops containing latanoprost

3

(marketed as the glaucoma drug Xalatan®) promote the eyelash hair growth" and that the Brandt references "showed that nearly 50% of patients using bimatoprost in eyedrop form were experiencing eyelash hair growth." *Id.* at 970.  It thus concluded that the claims were obvious.  The Court's invalidity analysis never mentioned eyelash darkness, as opposed to growth, which is not surprising because the '404 claims didn't require it.

Not only did this Court's analysis of the '404 patent never mention eyelash darkness, the parties didn't mention it either.  For example, a search of the trial transcript for the word "dark," or any permutation of it, shows that no expert witness ever discussed darkness in the context of opining on the validity of the '404 patent.  Instead, the only testimony concerning eyelash darkness from defendants' expert related to a different asserted patent (U.S. Patent No. 7,388,029, which is unrelated to the patent-in-suit here) and a description of Latisse's effects.  (A3458-59.)  Plaintiffs' experts only discussed darkness with respect to (1) unrelated side effects of bimatoprost eye drops—*i.e.*, iris pigmentation and darkening of the skin around the eyes, (A3470, A3474), and (2) the general structure of a hair follicle.  (A3536.)

Likewise, the parties' written submissions never discussed increasing eyelash darkness in connection with the '404 patent's validity.  Allergan's briefs instead referred to darkness only in other contexts:  (1) Latisse's FDA-approved

indication and effects, (2) a finding by one of the '029 inventors that rats treated with prostaglandin analogs like bimatoprost grew darker hair, (3) periocular darkening (*i.e.*, dark circles around the eyes) associated with the use of bimatoprost eye drops, and (4) a clinical observation made by Dr. VanDenburgh that in some cases glaucoma patients treated with bimatoprost eye drops experienced increased eyelash darkness. (A3334, A3371, A3388, A3247-90 at ¶¶ 40, 43, 44, 55, 58, 68, 158, 165; A3332, A3244-45 at ¶ 30; A3352.) And Defendants only used the term "darkness" in their post-trial briefs to refer to the '029 patent's disclosure, and Latisse's approved indication. (A3105; A3145, A3152.)

Consistent with the trial testimony and the parties' post-trial briefing, the district court never used the term "darkness" in its seventeen pages of analysis finding claim 14 of the '404 patent valid. (A3425-41.) And this Court's analysis of the '404 patent never mentioned eyelash darkness, much less included any finding that the prior art taught that bimatoprost could be used to darken eyelashes. *Allergan*, 754 F.3d at 968-70. Indeed, the Brandt references say nothing about eyelash darkness—they report only eyelash growth as a side effect.

### B.   The Second Suit:  the '054, '161, and '988 Patents Also Related to Methods of Enhancing Eyelash Growth.

While the first suit was pending, Allergan obtained three additional patents that were continuations of the '404 patent, namely U.S. Patent Nos. 8,038,988; 8,101,161; and 8,263,054. Allergan sued the Defendants for infringement, and the

district court stayed the cases pending this Court's resolution of the appeal in the first suit.  (A3575-76; A3616.)

After Defendants won the appeal, Apotex moved for judgment on the pleadings, arguing that Allergan was collaterally estopped from asserting the '988, '161, and '054 patents because they "claim *the same obvious subject matter* as [the] '404 patent claim 14—direct application of bimatoprost to the skin *to grow eyelashes* . . . ."  (A3586 (second emphasis added); A3626.)  Allergan responded by moving to voluntarily dismiss the patents with prejudice, which would moot Apotex's motion.  (A3643-45.)  Allergan also asked for a further opportunity to address collateral estoppel at any appropriate time if the court didn't grant its motion.  (A3608.)  The district court summarily granted Apotex's motion without providing Allergan with that opportunity to address collateral estoppel.  (A3613-15.)  The court's decision did not mention eyelash darkness or specifically compare any claims of the patents in the second suit with the '404 patent.  (*See id*.)  The court instead found them "substantially the same" without any analysis.  (A3614.)

## II.    The Present Litigation:  the District Court Invokes Collateral Estoppel, Even Though the Asserted Claims of the '953 Patent Cover Only Increasing Eyelash "Darkness."

### A.    The Asserted Claims of the '953 Patent Are Directed to Increasing Eyelash Darkness.

This history brings us to the present suit, in which Allergan has asserted U.S.

Patent No. 8,926,953, which is another continuation from the patent family that led to the '404 patent and the others in the prior litigation.  Unlike the other patents in the family, asserted claims 8 and 26 of the '953 patent require increasing eyelash darkness, as shown by the claim language below, with several unasserted claims included for context:

> 1. A method of enhancing the growth of one selected from the group consisting of eyelashes, eyebrows and scalp hair, wherein the method comprises topical application of a bimatoprost composition.

> 5. The method of claim 3, wherein the method is useful for the treatment of hypotrichosis of the eyelashes.

> 6. The method of claim 5, wherein the composition increases one attribute selected from the group consisting of length, thickness and darkness of eyelashes.

> 8. The method of claim 5, wherein *the composition increases the length, thickness __and__ darkness of eyelashes*.

> 26. The method of claim 6, wherein the attribute *is darkness*.

(A29 at 13:31-34, 13:41-45, 14:46-47 (emphasis added).)  Likewise, asserted claim 23 also requires increasing eyelash darkness, as shown below, with other unasserted claims included for context:

> 10. A method for use in enhancing the growth of one selected from the group consisting of eyelashes, eyebrows and scalp hair, comprising tropically applying at least once a day a composition comprising bimatoprost.

> 14. The method of claim 10, wherein the composition is a 0.03% w/v bimatoprost solution and is useful for treating hypotrichosis of the eyelashes by increasing one attribute selected from the group consisting of length,

thickness and darkness of eyelashes.

23. The method of claim 14, wherein the attribute *is darkness*.

(A29 at 14:6-9, 14:16-20, 14:40-41 (emphasis added).)  These references to darkness distinguish asserted claims 8, 23, and 26 from the '404 patent claims in the prior suit—the unchallenged claim construction of "stimulating hair growth" in the '404 patent included increasing the length, number, or thickness of hair but said nothing about darkness.  (*See* p. 2 above.)  Indeed, the PTO allowed these '953 patent claims despite considering the Johnstone PCT, all the Brandt references, this Court's prior opinion invalidating the '404 patent, and the district court's construction of the '404 patent.  (*See* A1167-68.)

## B.     The District Court Dismisses These Suits Based on Collateral Estoppel.

The suits here began when Allergan sued Defendants for infringing U.S. Patent No. 8,906,962, a continuation of the '029 patent from the prior litigation. (A300-11; A3650-81.)  Allergan later amended its complaint to add the '953 patent, and then sought leave to amend it again to limit the case to claims 8, 23, and 26 of the '953 patent (and drop the '962 patent).  (A363-65, A373-79; A1500, A1531-44; A449-68; A1621-51.)  Apotex opposed that amendment as futile, arguing that "Plaintiffs are collaterally estopped from asserting the '953 patent against Apotex," including the claims limited to increasing eyelash darkness. (A634.)  The Magistrate Judge rejected that argument, holding that Allergan had

8

made "plausible arguments against the applicability of issue preclusion in this case" and that there are "legitimate concerns as to the appropriateness of resolving an affirmative defense such as issue preclusion at the Rule 12(b)(6) stage" because resolving that issue requires addressing the merits. (A941-42.)

Nevertheless, after Allergan's second amended complaints were deemed filed, each defendant filed a new motion to dismiss based on collateral estoppel. (A957-63; A1918-21; A1994-96.) The district judge handled those motions herself and granted them, holding that collateral estoppel required a finding that the '953 patent was obvious. (A1-6; *see also* A8-9; A10-11.) The court noted that for collateral estoppel to apply in the Fourth Circuit, the proponent must establish the following five elements:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue [was] actually determined in the prior proceeding; (3) determination of the issue [was] a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment [is] final and valid; and (5) the party against whom the estoppel is asserted . . . had a full and fair opportunity to litigate the issue in the previous forum.

(A3.) The court found that Defendants met their burden for all five elements. (A4.)

The court found the first element met because "[a]ll five patents concern use of bimatoprost solution to grow eyelashes and the asserted claims of the '953 patent are substantially similar to the invalided claims of the '404, '054, '161, and '988 patents." (*Id.*) The court rejected Allergan's argument that the '953 claims

are limited to increasing eyelash darkness—it thought that "[t]he '953 patent is not

limited to darkness; the patent repeatedly references 'enhancing the growth' of

eyelashes by increasing length, thickness, and darkness." (*Id*.) But the court

ignored the language of the only asserted claims—claims 8, 23, and 26—which

explicitly requires a method that increases eyelash darkness.

The court then offered two other reasons why the asserted '953 patent claims

were supposedly similar to the previously invalidated claims. First, the court

observed that the preamble of some claims of the '054 patent (which was at issue

in the second suit) included language reciting "a method of increasing eyelash

growth in a human ***including*** length, thickness ***and*** darkness." (*Id*. (emphasis

added).) Yet the court did not attempt to actually construe that language, explain

why the preamble would be limiting, or explain why the word "and" should not be

construed as disjunctive. (*See* A3066-67.) Nor did the court mention that these

'054 patent claims had not been actually litigated in the second suit—the court had

dismissed them without substantive briefing by Allergan.

Second, the court suggested that the '404 patent really did implicate eyelash

darkness, because part of its construction of "stimulating hair growth" referenced

converting vellus or intermediate hair (which is non-pigmented) to terminal hair

(which is pigmented). (A4-5.) But, of course, the '404 claims also covered

increasing hair length, number, or thickness, regardless of whether they implicated

darkness, so darkness could not have been essential to the invalidity judgment in that case, and, indeed, was not, as shown by the discussion above. Having misidentified the issue in the prior litigations, the court found that the remaining elements of collateral estoppel were met. (*Id.*)

The district court's initial orders dismissing these cases invalidated ***all*** claims of the '953 patent as obvious, (A5; A9; A11), even though Allergan's second amended complaint only asserted claims 8, 23, and 26. (A949-53; A1884-92.) The court tried to correct this problem, entering separate "final judgments" for Apotex, Hi-Tech, and Akorn that invalidated only asserted claims 8, 23, and 26. (A7; A12-13.) Sandoz, however, would not agree to an amended judgment. So the initial judgment, declaring claims invalid that were not at issue, still stands, at least with respect to Sandoz.

These consolidated appeals followed.

## SUMMARY OF THE ARGUMENT

The district court's collateral estoppel judgment should be reversed. The asserted '953 claims require administering bimatoprost to increase eyelash "*darkness*." Neither prior suit actually decided—or even addressed—that issue.

The first suit (involving the '404 patent) turned solely on whether it would have been obvious to administer bimatoprost to increase eyelash "*growth*." This Court held that it was by relying on a statement in the Brandt references about eyelash growth to provide the required motivation and reasonable expectation of success. But the Brandt references contain no similar statement about darkness, so the validity issue presented by the '953 claims here is markedly different.

The second suit (involving the '054 patent) is even less relevant, because the parties didn't actually litigate validity. The court instead ruled on collateral estoppel grounds, without substantively hearing from Allergan. Regardless, the '054 patent claims are distinct from the '953 claims, because all of the '054 claims, as properly construed, can be practiced without enhancing eyelash darkness.

Collateral estoppel is also inapplicable because Allergan could not "fully" litigate the prior art status of the Brandt references in the prior suits. This Court's decision changed the controlling legal standard, requiring different evidence. Allergan has marshalled that evidence, and the Patent Office allowed the asserted '953 claims based on it, so the courts should be permitted to consider it here.

## LEGAL STANDARDS

A district court's grant of a Rule 12(b)(6) motion is reviewed *de novo*, with all facts alleged by the plaintiff taken as true. *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008). Collateral estoppel is a question of law reviewed *de novo*. *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1341 (Fed. Cir. 2013). Regional circuit law on collateral estoppel generally governs. *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013). In the Fourth Circuit, a party seeking to invoke it must show that:

> (1) The issue sought to be precluded is ***identical*** to the issue previously litigated; (2) the issue [was] ***actually determined*** in the prior proceeding; (3) the determination of the issue was a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment is final and valid; ***and*** (5) the party against whom estoppel is asserted . . . had a ***full and fair opportunity to litigate*** the issue in the previous forum.

*Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998) (emphasis added). But, if part of the collateral estoppel analysis involves patent-specific issues, then this Court's own law controls. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1341 n.1 (Fed. Cir. 2012) ("[T]he question whether a particular claim in a patent case is the same as or separate from another claim has special application to patent cases, and we therefore apply our own law to that issue.").

<u>**ARGUMENT**</u>

**I.    The District Court's Invalidity Judgment Based on Collateral Estoppel Should Be Reversed.**

Multiple elements required for collateral estoppel are missing in this case. The validity issues raised by the asserted claims of the '953 patent are not "identical" to those previously adjudicated nor were they "actually determined" in the prior proceedings.  And the asserted '953 patent claims present issues that Allergan has not had a "full and fair opportunity to litigate" in prior litigation.  We discuss each point further below and demonstrate that the district court erred in applying collateral estoppel.

**A.    The Eyelash Darkness Claims Here Present a Different Issue than the Eyelash Growth Claims that Was Previously Decided.**

**1.    The Obviousness of Using Bimatoprost to Darken Eyelashes Was Not Decided in the Prior Cases.**

When a party attempts to invoke collateral estoppel against patent claims that have not previously been litigated, the court must consider whether those claims raise any new issues of validity that were not considered in prior litigation. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1136 (Fed. Cir. 1985). "Where obviousness is the basis for the prior invalidity holding, an inquiry into the identity of the validity issue is more properly phrased in terms of the factual inquiries mandated by *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966), as a prerequisite to such a validity determination." *Id*.  The Court must examine

"whether the nonlitigated claims present new issues as to the art pertinent to the nonlitigated claims; as to the scope and content of that art; as to the differences between the prior art and the nonlitigated claims; and as to the level of ordinary skill in that art." *Id*. The district court here failed to conduct this analysis, and, had it done so, it would have found that the asserted '953 claims present new factual issues that were not previously resolved.

The asserted '953 claims are all limited to methods of using bimatoprost to increase eyelash darkness. For example, claim 8 requires a method of using a bimatoprost composition that "increases the length, thickness ***and darkness*** of eyelashes," while claim 23 requires that the composition increases "darkness." (A29 at 14:1-2, 14:40-42.) Claim 26 is similar and covers a method of using a 0.03% w/v bimatoprost composition to treat hypotrichosis of the eyelashes by increasing "darkness." (A29 at 14:45-46.) A person would not be practicing these claims if the application of bimatoprost didn't increase eyelash darkness. By the same token, the prior art would not invalidate these claims unless it would have been obvious that applying bimatoprost would increase eyelash darkness.

The parties' prior cases addressed whether it would have been obvious to use bimatoprost to increase eyelash growth, not eyelash darkness. This Court's invalidation of claim 14 of the '404 patent for obviousness was based on the Johnstone PCT and the Brandt references, and the Court's analysis focused solely

on whether it would have been obvious to use bimatoprost to promote "eyelash

hair growth," as shown by the following excerpts of the decision:

- "[T]he Brandt references disclose a substantial rate of ***eyelash hair growth*** as a side effect of using bimatoprost in eyedrops." *Allergan*, 754 F.3d at 970 (emphasis added).

- "Johnstone details at length how eyedrops containing latanoprost (marketed as the glaucoma drug Xalatan®) promote the ***eyelash hair growth*** through the mechanism of fluid containing latanoprost making topical contact with the eyelid." *Id*.

- "In light of the Brandt reference's disclosure of bimatoprost's effect in ***growing eyelash hair***, a person of ordinary skill in the art would have had substantial motivation to follow Johnstone and use topical application of bimatoprost to grow eyelash hair." *Id*.

- "Likewise, the Brandt references provided a reasonable expectation of success for the topical application of bimatoprost. Clinical trials showed that nearly 50% of patients using bimatoprost in eyedrop form were experiencing ***eyelash hair growth***." *Id*.

The Court's focus on "hair growth" was natural, because claim 14 of the '404

patent required stimulating hair growth. Likewise, the district court resolved the

parties' second case by simply carrying forward the decision from the first case

and applying collateral estoppel. (A3613-15; A3647-49.) Given that this Court's

decision shows that the first suit addressed obviousness only with respect to "hair

growth," the second suit could have turned only on "hair growth" as well—

otherwise, it couldn't have been resolved based on collateral estoppel.

Determining whether it would have been obvious to use bimatoprost to

increase eyelash darkness (as opposed to growth), presents distinct factual issues

16

regarding the prior art.  Neither the Brandt references nor the Johnstone PCT

disclose a method of using a bimatoprost composition to increase eyelash darkness,

as required by the asserted claims of the '953 patent.  The Brandt references do not

discuss increased eyelash darkness at all; they are instead limited to disclosing

"eyelash growth" as a side effect of using bimatoprost to treat glaucoma.  *Allergan*,

754 F.3d at 966-67.  Yet the Brandt references were the key link in this Court's

obviousness analysis on claim 14 of the '404 patent—the Court cited them as both

the motivation to apply Johnstone's teaching to bimatoprost and the reasonable

expectation of success.  *Id*. at 970.  Without the Brandt references, this Court could

not have found obviousness, and, indeed, the district court had initially found non-

obviousness when it conducted the analysis without the Brandt references' data

linking bimatoprost to eyelash growth.  *Id*.  That is exactly the situation now

presented by this case.  The Brandt references say nothing about eyelash darkness,

so nothing provides either the motivation or the reasonable expectation of success

needed to prove the asserted '953 patent claims would have been obvious.

Appellees would instead have to argue obviousness here by falling back on a

general discussion in the Johnstone PCT that applying a different molecule

(latanoprost) increased eyelash darkness.  (A1253-88.)  But Defendants offered no

evidence in the prior cases that a skilled artisan would expect bimatoprost to

behave the same as latanoprost with respect to increasing eyelash darkness, nor do

they present any evidence on that point here.  In fact, the parties' first suit included a mountain of evidence showing that latanoprost and bimatoprost behave differently.  Allergan's ophthalmologist expert, who has over a decade of experience with both compounds, testified that bimatoprost and latanoprost compositions are not interchangeable because they work differently, elicit different patient responses, and have different side effects.  (A1291-92.)  Likewise, one of the '953 patent's inventors testified that "there are many effects produced by Xalatan [(or latanoprost)] which are not produced by bimatoprost" and that the two are "pharmacologically entirely different."  (A1310.)  Clinical trials confirmed this testimony, reporting that bimatoprost and latanoprost show significantly different efficacy for glaucoma, rates of hyperemia (red eye), and eyelash growth.  (*See* A1302-05; A1293-96.)  This led the district court to find in the prior case that latanoprost and bimatoprost behave quite differently, including their anticipated side effects.  (A3434 (concluding that bimatoprost "was understood to be pharmacologically different than other prostaglandin analogs," such as latanoprost).)  This Court did not disturb or otherwise criticize the factual finding that persons of ordinary skill understood the two compounds to behave very differently.  *See generally Allergan*, 754 F.3d 952.  So the fact that bimatoprost and latanoprost may have some common effects (*e.g.*, causing eyelash growth) isn't necessarily a reason to think that Johnstone's teaching about eyelash darkness

has any applicability to bimatoprost.  In any event, the point for present purposes is that the relative similarity or difference between using bimatoprost and latanoprost to enhance eyelash *darkness* wasn't decided in the prior cases, so it should be actually analyzed and determined in this one.

### 2.    The District Court's Reasons for Finding the Issue Here Identical to Prior Cases Are All Unpersuasive.

None of the district court's reasons for finding that this case presents the same issue as the prior suits was persuasive.  The court's initial error was in focusing broadly on the specifications of the '953 patent and the patents in the prior suits rather than the specific claims.  (A4 (opining that "[a]ll five patents *concern* use of a bimatoprost solution to grow eyelashes") (emphasis added).)  But this Court has repeatedly instructed that each patent's claims are separately presumed valid and must be individually assessed to determine if they present unique validity issues.  *See, e.g.*, *SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1332-33 (Fed. Cir. 1999) (applying Fourth Circuit law and rejecting collateral estoppel on different patent than the one litigated because issue was not identical); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1539 (Fed. Cir. 1995) (rejecting collateral estoppel in a second suit where the patent was related to a patent from a first suit through a divisional application and noting that patents are presumed to cover "separate and distinct inventions," so "it cannot be presumed that related patents rise and fall together"); *Applied Materials,*

*Inc. v. Gemini Research Corp.*, 835 F.2d 279, 281 (Fed. Cir. 1987) (vacating

holding that a patent was invalid due to collateral estoppel where claims of a parent

application were rejected by the CCPA because the district court failed to account

for the patent's presumption of validity).  The district court thus erred by pointing

to references in the '953 patent specification about "enhancing the growth" of

eyelashes.  (*See* A4.)  The '953 patent's asserted claims, in contrast, require

enhancing eyelash darkness, so that is the relevant point of comparison with the

prior cases.

The district court also erred by suggesting that the asserted '404 patent claim

from the first case required increasing eyelash darkness.  (A4-5.)  The claim at

issue there required "a method for stimulating hair growth," which the district

court construed in the prior case to include increasing the length, number, or

thickness of hair:

> a method of converting vellus or intermediate hair to growth as terminal
> hair, increasing the rate of hair growth, increasing the number of anagen
> hairs, decreasing the number of telogen hairs, preventing atrophy of hair
> follicles, stimulating the growth of vellus hair to terminal hair on the skin, or
> ***increasing the length, number or thickness of hair***.

(A3069-70; A3072-73 (emphasis added).)  That construction was not challenged

on appeal, and it is satisfied by showing hair growth alone, regardless of any

impact on darkness.  That is why the parties' briefing and this Court's decision

focused only on hair growth, not darkness.  Although the district court tried in this

case to retrospectively read a darkness gloss into this language by pointing to the differences between "intermediate" and "terminal" hair, (A4-5), the construction would still be satisfied simply if the hair grew longer or thicker, regardless of whether it became darker—indeed, terminal hair itself is longer than intermediate hair. (*See, e.g.*, A23 at 1:44-51.) So eyelash darkness never had to be litigated to prove the invalidity of the '404 patent claims, and it never was.

The district court likewise erred in suggesting that the darkness issue had been decided in the second suit for the '054 patent. (A4.) The claim language sets forth a list using the open term "including" and then three alternatives (length, thickness, darkness), suggesting that they are to be understood in the disjunctive, and that only an increase in one of the listed characteristics is required. *Cf. Allergan*, 754 F.3d at 957 (recognizing, with respect to a different patent family, that the word "and" should be read as disjunctive in the phrase "'treating hair loss' includes arresting hair loss or reversing hair loss, or both, and promoting hair growth"). So this Court's prior opinion from the first case would necessarily invalidate these claims as properly construed, because if it were obvious that bimatoprost increased eyelash length or thickness, it would not matter whether enhancing darkness were covered. In fact, the issue in the first case was entirely about eyelash length and thickness—the Brandt references reported glaucoma patients seeing "eyelash growth," which implicates length, not darkness. The

claims here are different than those in the first case—none of the claims here can be practiced without enhancing darkness.

What is more, the judgment in the second suit cannot have preclusive effect on the "darkness" issue regardless of how the '054 patent claims are construed, because it was never actually litigated there. The parties never briefed "darkness" there, the district court's opinion never discussed it, and, indeed, the district court acted without even giving Allergan a chance to address any substantive differences between the claims. So none of the traditional criteria that this Court uses to find an issue was previously decided is present here. *See, e.g.*, *In re Freeman*, 30 F.3d 1459, 1466 (Fed. Cir. 1994) (explaining the requirement that an issue be actually decided is "generally satisfied if the parties to the original action disputed the issue and the trier of fact decided it"); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e (1982) ("A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action.").

### B. Allergan Didn't Previously Have a Full and Fair Opportunity to Litigate the Validity of Claims to "Increasing Eyelash Darkness."

The district court's collateral estoppel ruling was also incorrect because the validity of the asserted '953 patent claims turns on issues that Allergan didn't have a full and fair opportunity to litigate in either of the prior suits. An issue is not fully and fairly litigated where "without fault of [its] own the patentee was

22

deprived of crucial evidence . . . in the first litigation." *Dana Corp. v. NOK, Inc.*, 882 F.2d 505, 508 (Fed. Cir. 1989). Here, Allergan was deprived of the opportunity to show in the first suit that the Brandt references were its inventors' own prior work and thus not prior art under § 102(a), because the legal standard changed on appeal. Allergan has now collected new evidence that satisfies the new standard and should be permitted to present it in this case.

The prior art status of the Brandt references was not "fully" litigated in the parties' first case. Allergan had attempted to show that they were not prior art by invoking *In re Katz*, 687 F.2d 450 (CCPA 1982), which held that "one's own work is not prior art under 102(a) even though it has been disclosed to the public in a manner or form which otherwise would fall under 102(a)." *Id*. at 454. *Katz* determined that, in the prosecution context, an inventor could successfully invoke the exception for a paper where he and two co-authors were named as authors by submitting a declaration explaining that the co-authors were merely acting under his direction and supervision. *Id.* at 455-56. But this Court's decision in the parties' first case added a new requirement to *Katz*—that the inventor was "responsible for directing the production" of the publication's content. *See Allergan*, 754 F.3d at 969 ("The relevant inquiry must be whether the Brandt references . . . were solely Dr. VanDenburgh's work and hers alone."); *id.* ("Appellees have produced no evidence . . . demonstrating that the Brandt

references were in fact printed publications authored by Dr. VanDenburgh for the purposes of section 102(a)."); *id.* ("Appellees have not produced evidence that shows she was responsible for directing the production of either article's content."). Allergan had not put in any evidence on that point because it had not previously been part of the *Katz* standard and thus was unable to litigate the issue "fully."

After receiving this Court's opinion in the prior appeal, Allergan collected the necessary evidence and submitted it to the Patent Office during prosecution of the '953 patent-in-suit. For example, inventor Dr. VanDenburgh submitted a declaration explaining her inventive role in designing the clinical trials discussed in the Brandt references that examined bimatoprost for glaucoma treatment and in reviewing the data from those trials, including that she "was the first to observe that a portion of the patients administered bimatoprost grew eyelashes as a side effect." (A1312.) Dr. VanDenburgh also explained that she was aware of the Brandt references, and that the other authors on those references "did not make inventive contributions to the ['953] application." (A1312-13.) Allergan also submitted declarations from the other authors on the Brandt references—authors who did not testify in the prior case—establishing that the work in those references was Dr. VanDenburgh's work and that they "did not conceive the subject matter" of the '953 patent. (A1315-16; A1318-19; A1321-22; A1324-25.) After

considering these declarations, the examiner allowed the claims of the '953 patent

over the Brandt references, the other cited prior art, as well as this Court's prior

opinion on the '404 patent.  (*See* A1167-68.)  The Patent Office's decision

demonstrates that this new evidence could remove the Brandt references as prior

art to the asserted '953 patent claims, which would make the invalidity analysis

here far different than in the Court's prior opinion.

Given the availability of this new evidence, this Court should decline to

apply collateral estoppel in this case.  An intervening change in the law often

justifies declining to give a prior judgment preclusive effect.  *See, e.g.*, *CIR v.

Sunnen*, 333 U.S. 591, 600 (1948) (finding no collateral estoppel where intervening

decision changed the "legal atmosphere" so "as to render the rule of collateral

estoppel inapplicable."); RESTATEMENT (SECOND) OF JUDGMENTS § 28(2)(b) (1982)

(stating that collateral estoppel does not apply where "[t]he issue is one of law and

. . . a new determination is warranted in order to take account of an intervening

change in the applicable legal context or otherwise to avoid inequitable

administration of the laws").  Here, the newly-added requirement from the prior

case is precisely the type of change in law that precludes collateral estoppel

because, had Allergan known about the requirement, it could have readily provided

this additional evidence in the prior case, just as it did to the Patent Office during

prosecution of the '953 patent.  The district court erred in concluding otherwise,

and, indeed, did not even address this argument in its decision dismissing this case. The judgment invalidating claims 8, 23, and 26 of the '953 patent should therefore be reversed.

## II.    The District Court Erroneously Invalidated Unasserted Claims of the '953 Patent.

At a minimum, this Court should vacate the district court's judgment to the extent it can be read to invalidate any claims other than asserted claims 8, 23, and 26 of the '953 patent.  Allergan expressly notified the Defendants (and the court) that its operative complaint in this case would "be limited to claims 8, 23, and 26." (A944-56; A1875-98.)  The district court thus had no subject matter jurisdiction over any of the other claims of the '953 patent and no power to invalidate them. *See, e.g.*, *Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed. Cir. 1984) ("Since Webb only asserted and litigated the infringement of claims 1, 3, 4, 8, 9 and 11, and the evidence in the record is inadequate to indicate the existence of a case or controversy regarding the remaining claims in the invalidity declaratory judgment counterclaim, we vacate that portion of the district court's holding regarding the invalidity of claims 2, 5-7, 10 and 12.").

The district court's judgments in these consolidated cases nevertheless leave some ambiguity about their scope.  The court's initial order granting Defendants' motions to dismiss applied to the entire '953 patent.  (A5-6 ("The '953 patent is hereby declared and adjudged invalid as obvious under 35 U.S.C. § 103."); A8-9

26

(same); A10-11 (same).)  The district court entered separate "final judgments" that mostly fixed the problem, because they state that only claims 8, 23, and 26 were invalid.  (A12 ("Claims 8, 23 and 26 of the '953 patent are hereby declared and adjudged invalid as obvious under 35 U.S.C. § 103."); A7 (same).)  But the problem is that Sandoz refused to join the stipulated final judgment in the case where it was a defendant (Case No. 14-cv-1034), and instead only its co-defendants Akorn and Hi-Tech did.  (A12-13.)  So the result is ambiguity about whether there is still an operative judgment that incorrectly invalidates all of the '953 patent claims.  This Court should eliminate any such ambiguity and, at a minimum, make clear that the invalidity judgment here does not apply to the unasserted claims.

## CONCLUSION

For the reasons above, Allergan respectfully requests that this Court reverse the district court's judgment granting Defendants' motion to dismiss and invalidating claims of the '953 patent based on collateral estoppel or, at a minimum, vacate the judgment applying to unasserted '953 claims.

Dated:  March 25, 2016                    Respectfully submitted,

*/s/ Jonathan E. Singer*
Jonathan E. Singer
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that I electronically filed the foregoing document using the Court's

CM/ECF filing system on March 25, 2016.  All counsel of record were served via

CM/ECF on March 25, 2016.


*/s/ Jonathan E. Singer*
Jonathan E. Singer

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that Appellee's Responsive Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). The relevant portions of the brief, including all footnotes, contain 6,496 words, as determined by Microsoft Word.

Dated:  March 25, 2016

*/s/ Deanna J. Reichel*
Deanna J. Reichel
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALLERGAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-1028 |
| | ) | |
| APOTEX, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND JUDGMENT

   This is the third patent infringement lawsuit plaintiffs have filed against Apotex, Inc. and Apotex Corp. attempting to prevent Apotex from manufacturing and selling a generic version of a prescription drug known as Latisse.[1]  The Court finds that plaintiffs are collaterally estopped from asserting that defendants are infringing the patent at issue in this case by the findings of the courts in the two previous cases.  The defendants' motion to dismiss will be granted.

   The Court takes judicial notice of the decision by the Federal Circuit in *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952 (Fed. Cir. 2014)(reversing decisions of this Court in 10cv681, 11cv298, and 11cv650), and of the decisions of this Court in *Allergan, Inc. v. Apotex Inc., et al.,* 12cv247, (Docs. 114 and 115), and *Allergan, Inc. v. Apotex Inc.*, et al, 13cv16, (Docs. 77 and 78), as well as related orders, briefs, and evidence as are relevant.

_____

   [1] Apotex, Inc. submitted Abbreviated New Drug Application ("ANDA") No. 201894 ("Apotex Inc.'s ANDA") to the United States Food and Drug Administration ("FDA") seeking approval to commercially manufacture, use, and sell 0.03% bimatoprost ophthalmic solution. This solution would be a generic version of Latisse.

In those cases, plaintiff alleged that Apotex's proposed manufacture and sale of a 0.03%

bimatoprost ophthalmic solution would violate several patents, specifically, *inter alia*,

U.S. Patent Nos. 7,351,404 B2 ("the '404 patent"),  8,263,054 ("the '054 patent"),

8,101,161 ("the '161 patent"), and 8,038,988 ("the '988 patent").  All of those cases were

resolved favorably to Apotex upon findings that the patents were invalid as obvious.[2]

In this action, plaintiff alleges that Apotex's proposed manufacture and sale of a

0.03% bimatoprost ophthalmic solution would infringe of one or more of the methods

claimed in claims 8, 23, and 26 of U.S. Patent No. 8,926,953 B2 ("the '953 patent").

(*See* Doc. 32 at ¶ 41.)  Apotex contends that the decisions by the Federal Circuit and this

Court that the '404, '988, '161, and '054 patents are invalid as obvious bar Allergan's

claims in this case.  (*See* Doc. 36.)  The Court agrees.

In appropriate circumstances, the questions of collateral estoppel and res judicata

may be decided on a Rule 12(b)(6) motion to dismiss.  *Brooks v. Arthur,* 626 F.3d 194,

200 (4th Cir. 2010); *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) ("This Court

has previously upheld the assertion of res judicata in a motion to dismiss.").  The

---

[2] Specifically, on June 10, 2014, the United States Court of Appeals for the Federal
Circuit issued its Opinion finding, *inter alia*, asserted claim 14 of the '404 patent was invalid as
obvious.  *Allergan*, 754 F.3d at 970.  This Court thereafter, on January 14, 2015, entered Final
Judgment against plaintiffs and in favor of Apotex that claim 14 of the '404 is "declared to be
invalid as obvious under 35 U.S.C. § 103."  *Allergan*, 10cv681, Doc. 250.  Around the same
time, in the two related cases, the Court entered Final Judgment against plaintiffs and in favor of
Apotex that the '054 patent, the '161 patent, and the '988 patent "are declared and adjudged
invalid as obvious under 35 U.S.C. § 103" and that "Allergan is collaterally estopped from
asserting the '988, '161, and '054 patents against Apotex or contesting the invalidity of those
patents."  *Allergan,* 12cv247, Docs. 114 and 115; *Allergan,* 13cv16, Docs. 77 and 78.

2

Court "may take judicial notice of facts from a prior judicial proceeding when the res judicata defense raises no disputed issue of fact." *Andrews*, 201 F.3d at 524 n.1.

Collateral estoppel forecloses the "relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." *Virginia Hosp. Ass'n v. Baliles*, 830 F.2d 1308, 1311 (4th Cir. 1987). For collateral estoppel to apply, the proponent must establish that:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue [was] actually determined in the prior proceeding; (3) determination of the issue [was] a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment [is] final and valid; and (5) the party against whom the estoppel is asserted . . . had a full and fair opportunity to litigate the issue in the previous forum.

*Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

In a patent infringement context, the application of collateral estoppel is not limited to "patent claims that are identical." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013). "Rather, it is the identity of the *issues* that were litigated that determines whether collateral estoppel should apply." *Id.* (original emphasis). "If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies." *Id.* at 1342. The mere use of different words in the unadjudicated claims does not necessarily create a new issue of invalidity. *Id.* at 1343. Instead, the courts examine whether the asserted claims are "substantially similar" to the

3

invalidated claims, *id*. at 1342, and whether any differences in the asserted claims are "patentably significant" in a way that "changes the invalidity analysis." *Id*. at 1343.

Here, Apotex has shown all five conditions. The issue sought to be precluded is identical to one previously litigated. All five patents concern use of a bimatoprost solution to grow eyelashes, and the asserted claims of the '953 patent are substantially similar to the invalidated claims of the '404, '054, '161, and '988 patents. The determination of the invalidity-based-on-obviousness issue was a critical and necessary part of the decision in the prior proceedings and was actually determined in the prior proceedings; indeed, it was the reason the Federal Circuit reversed this Court's invalidity conclusion as to the '404 patent and it was the reason judgment was entered as to the '054, '161 and '988 patents. The prior judgments are final and valid, and the plaintiff had a full and fair opportunity to litigate the issue in the previous cases.

Plaintiff contends that the issue is different as to the '953 patent because the '953 patent only concerns darkness of eyelashes whereas the '404 '054, '161 and '988 patents only concerned growth of eyelashes. The '953 patent is not limited to darkness; the patent repeatedly references "enhancing the growth" of eyelashes by increasing length, thickness and darkness. The same is true in the '054 patent, for example, where Claims 5 and 14 cover "a method of increasing eyelash growth in a human including length, thickness and darkness." The '404 trial was not limited to just "more eyelashes;" also at issue were such things as length, thickness, and pigment, i.e., darkness. For example, the Court's claim construction as to the '404 patent included a construction of the term "a

4

method for stimulating hair growth" to mean, inter alia, "a method of converting vellus or intermediate hair to growth as terminal hair." The '404 patent itself, just like the '953 patent, provides that "terminal hairs are coarse, pigmented, long hairs" and vellus hairs "are fine, thin, non-pigmented short hairs." Thus, this construction of the disputed claim by definition included darkness by its reference to pigment.

Plaintiff also contends that Apotex's argument is precluded by the Magistrate Judge's decision allowing plaintiff to file a second amended complaint over a futility objection by Apotex. In ruling on the motion to amend, the Magistrate Judge appropriately applied a lower standard ("clearly insufficient or frivolous on its face") than that which applies to a Rule 12(b)(6) motion. Even if that were not so, there is no reason this Court cannot re-evaluate the issue based on the undisputed record.

The '953 patent at issue in this case claims priority to, and substantially the same subject matter as, invalid '404 patent claim 14 and the relevant claims of the '054, '161, and '988 patents. Plaintiff is collaterally estopped from pursuing its claims of patent infringement because it has been conclusively determined in other proceedings that the claims at issue are invalid due to obviousness.

Now therefore, it is hereby ORDERED and ADJUDGED that:

1.    Dismissal is entered with prejudice in favor of Apotex and against Allergan on all of Allergan's claims alleging infringement of the '953 patent;

2.    The '953 patent is hereby declared and adjudged invalid as obvious under 35 U.S.C. § 103; and

3.      Allergan is collaterally estopped from asserting the '953 patent against

Apotex or contesting the invalidity of the '953 patent.

SO ORDERED, this 31st day of August, 2015.


_____

UNITED STATES DISTRICT JUDGE

6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALLERGAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-1028 |
| | ) | |
| APOTEX, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **FINAL JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the Court's Order and Judgment dated August 31, 2015, [Doc. 45], it is hereby ORDERED and ADJUDGED that:

1.    Dismissal is entered with prejudice in favor of Apotex Inc. and Apotex Corp. (collectively, "Apotex") and against Allergan, Inc. ("Allergan") on all of Allergan's claims alleging infringement of U.S. Patent No. 8,926,953 B2 ("the '953 patent");

2.    Claims 8, 23 and 26 of the '953 patent are hereby declared and adjudged invalid as obvious under 35 U.S.C. § 103; and

3.    Allergan is estopped from asserting claims 8, 23 and 26 of the '953 patent against Apotex or contesting the invalidity of claims 8, 23 and 26 of the '953 patent.

SO ORDERED, this 28th day of September, 2015.

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALLERGAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:14-CV-1034 |
| | ) | |
| SANDOZ, INC., AKORN, INC., and HI-TECH | ) | |
| PHARMACAL CO., INC., | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER AND JUDGMENT**

WHEREAS, defendant Sandoz Inc. submitted Abbreviated New Drug Application ("ANDA") No. 201894 ("Sandoz Inc.'s ANDA") to the United States Food and Drug Administration ("FDA") seeking approval to commercially manufacture, use, and sell 0.03% bimatoprost ophthalmic solution;

WHEREAS, plaintiff Allergan, Inc. instituted this action against defendant Sandoz Inc. asserting and alleging infringement of claims 8, 23, and 26 of U.S. Patent No. 8,926,953 B2 ("the '953 patent");

WHEREAS, on June 10, 2014, the United States Court of Appeals for the Federal Circuit issued its Opinion finding, inter alia, asserted claim 14 of U.S. Patent No. 7,351,404 B2 ("the '404 patent") invalid as obvious;

WHEREAS, on January 14, 2015, this Court entered its Final Judgment that claim of the '404 is "declared to be invalid as obvious under 35 U.S.C. § 103";

WHEREAS, on January 14, 2015, this Court entered its Final Judgment that U.S. Patent Nos. 8,263,054 ("the '054 patent"); 8,101,161 ("the '161 patent"); and 8,038,988

("the '988 patent") "are declared and adjudged invalid as obvious under 35 U.S.C. § 103" and that "Allergan is collaterally estopped from asserting the '988, '161, and '054 patents … or contesting the invalidity of those patents";

WHEREAS, the '953 patent claims priority to, and substantially the same subject matter as, invalid '404 patent claim 14 and the relevant claims of the '054, '161, and '988 patents;

WHEREAS, Sandoz has moved this Court to dismiss plaintiff's claims against Sandoz alleging infringement of the '953 patent pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted;

For the reasons stated more specifically in the Court's opinion in *Allergan, Inc. v. Apotex, Inc.*, et al, 14cv1028, [Doc. 45, filed August 31, 2015], it is hereby ORDERED AND ADJUDGED that:

1.     Dismissal is entered with prejudice in favor of Sandoz and against plaintiff on all of plaintiff's claims alleging infringement of the '953 patent;

2.     The '953 patent is hereby declared and adjudged invalid as obvious under U.S.C. § 103; and

3.     Allergan is collaterally estopped from asserting the '953 patent against Sandoz or contesting the invalidity of the '953 patent.

**SO ORDERED**, this 31st day of August, 2015.

_____
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALLERGAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-1034 |
| | ) | |
| SANDOZ, INC., AKORN, INC., and | ) | |
| HI-TECH PHARMACAL CO., INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND JUDGMENT

WHEREAS, defendant Hi-Tech Pharmacal Co., Inc. and its successor-in-interest, Akorn, Inc. (collectively, "Akorn") submitted Abbreviated New Drug Application ("ANDA") No. 203051 ("Akorn's ANDA") to the United States Food and Drug Administration ("FDA") seeking approval to commercially manufacture, use, and sell 0.03% bimatoprost ophthalmic solution;

WHEREAS, plaintiffs Allergan, Inc. instituted this action against Akorn asserting and alleging infringement of claims 8, 23, and 26 of U.S. Patent No. 8,926,953 B2 ("the '953 patent");

WHEREAS, on June 10, 2014, the United States Court of Appeals for the Federal Circuit issued its Opinion finding, *inter alia*, asserted claim 14 of U.S. Patent No. 7,351,404 B2 ("the '404 patent") invalid as obvious;

WHEREAS, on January 14, 2015, this Court entered its Final Judgment that claim 14 of the '404 patent is "declared to be invalid as obvious under 35 U.S.C. § 103";

WHEREAS, on January 14, 2015, this Court entered its Final Judgment that

U.S. Patent Nos. 8,263,054 ("the '054 patent"); 8,101,161 ("the '161 patent"); and

8,038,988 ("the '988 patent") "are declared and adjudged invalid as obvious under 35

U.S.C. § 103" and that "Allergan is collaterally estopped from asserting the '988,

'161, and '054 patents … or contesting the invalidity of those patents";

WHEREAS, the '953 patent claims priority to, and substantially the same subject

matter as, invalid '404 patent claim 14 and the relevant claims of the '054, '161, and

'988 patents;

WHEREAS, Akorn has moved for judgment on the pleadings of plaintiff's

claims against Akorn alleging infringement of the '953 patent pursuant to Federal

Rule of Civil Procedure 12(c);

Based on these facts of record and for the reasons stated more specifically in the

Court's opinion in *Allergan, Inc. v. Apotex, Inc*., et al, 14cv1028, [Doc. 45, filed August

31, 2015], it is hereby ORDERED AND ADJUDGED that:

1.      Dismissal is entered with prejudice in favor of Akorn and against

plaintiff on all of plaintiff's claims alleging infringement of the '953 patent;

2.      The '953 patent is hereby declared and adjudged invalid as obvious under

U.S.C. § 103; and

3.      Allergan is collaterally estopped from asserting the '953 patent against

Akorn or contesting the invalidity of the '953 patent.

**SO ORDERED**, this 31st day of August, 2015.

_____
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALLERGAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-1034 |
| | ) | |
| SANDOZ, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the Court's Order and Judgment dated August 31, 2015 [Doc. 72 (and as referring to Doc. 45 in *Allergan, Inc. v. Apotex, Inc., et al*, 14-CV-1028)], it is hereby **ORDERED AND ADJUDGED** that:

1.    Dismissal is entered with prejudice in favor of Akorn, Inc. and Hi-Tech Pharmacal Co., Inc. (collectively, "Akorn") and against Allergan, Inc. ("Allergan") on all of Allergan's claims alleging infringement of U.S. Patent No. 8,926,953 B2 ("the '953 patent");

2.    Claims 8, 23 and 26 of the '953 patent are hereby declared and adjudged invalid as obvious under 35 U.S.C. § 103; and

3.      Allergan is collaterally estopped from asserting claims 8, 23 and 26 of the ‘953 patent against Akorn or contesting the invalidity of claims 8, 23 and 26 of the ‘953 patent.

**SO ORDERED**, this 29th day of September, 2015.

_____

UNITED STATES DISTRICT JUDGE

2



US008926953B2

(12) **United States Patent**   (10) **Patent No.:**   **US 8,926,953 B2**
Woodward et al.   (45) **Date of Patent:**   *Jan. 6, 2015

(54) **METHOD OF ENHANCING HAIR GROWTH**

(71) Applicant: **Allergan, Inc.,** Irvine, CA (US)

(72) Inventors: **David F. Woodward**, Lake Forest, CA (US); **Amanda M. VanDenburgh**, Huntington Beach, CA (US)

(73) Assignee: **Allergan, Inc.,** Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/937,512**

(22) Filed: **Jul. 9, 2013**

(65) **Prior Publication Data**

US 2013/0296435 A1   Nov. 7, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/441,783, filed on Apr. 6, 2012, which is a continuation of application

(Continued)

(51) **Int. Cl.**
*A61K 8/00*   (2006.01)
*A61K 8/18*   (2006.01)

(Continued)

(52) **U.S. Cl.**
CPC .................. *A61K 8/42* (2013.01); *A61K 31/165* (2013.01); *A61K 31/557* (2013.01); *A61K 31/558* (2013.01); *A61Q 7/00* (2013.01); *A61Q 7/02* (2013.01)
USPC ...................................................... **424/70.1**

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,382,247 A   5/1968 Anthony et al.
3,644,363 A   2/1972 Kim
(Continued)

FOREIGN PATENT DOCUMENTS

CA   1208560   7/1986
CA   2144967   3/1994
(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 90/009,431, filed Mar. 10, 2009, Murray Johnstone.

(Continued)

*Primary Examiner* — Paul Dickinson
(74) *Attorney, Agent, or Firm* — Lorenz Siddiqi

(57)   **ABSTRACT**

Methods and compositions for stimulating the growth of hair are disclosed wherein said compositions include a cyclopentane heptanoic acid, 2-cycloalkyl or arylalkyl compound represented by the formula I

$$R_1 \qquad Z$$
$$A—B$$
$$R_2 \qquad X$$

wherein the dashed bonds represent a single or double bond which can be in the cis or trans configuration, A, B, Z, X, $R_1$ and $R_2$ are as defined in the specification. Such compositions are used in treating the skin or scalp of a human or non-human animal. Bimatoprost is preferred for this treatment.

**26 Claims, 1 Drawing Sheet**



OD   OS

BASELINE

MONTH 6

**US 8,926,953 B2**

Page 2

### Related U.S. Application Data

No. 13/356,284, filed on Jan. 23, 2012, now Pat. No. 8,263,054, which is a continuation of application No. 12/425,933, filed on Apr. 17, 2009, now Pat. No. 8,298,518, which is a continuation of application No. 11/943,714, filed on Nov. 21, 2007, now Pat. No. 8,038,988, which is a continuation of application No. 11/805,122, filed on May 22, 2007, now Pat. No. 8,101,161, which is a continuation of application No. 10/345,788, filed on Jan. 15, 2003, now Pat. No. 7,351,404.

(60) Provisional application No. 60/354,425, filed on Feb. 4, 2002.

(51) **Int. Cl.**

| | |
|---|---|
| *A61Q 5/00* | (2006.01) |
| *A61Q 9/00* | (2006.01) |
| *A61K 8/42* | (2006.01) |
| *A61K 31/165* | (2006.01) |
| *A61K 31/557* | (2006.01) |
| *A61K 31/558* | (2006.01) |
| *A61Q 7/00* | (2006.01) |
| *A61Q 7/02* | (2006.01) |

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,128,577 | A | 12/1978 | Nelson |
| 4,139,619 | A | 2/1979 | Chidsey |
| 4,311,707 | A | 1/1982 | Birnbaum et al. |
| 4,543,353 | A | 9/1985 | Faustini et al. |
| 4,596,812 | A | 6/1986 | Chidsey et al. |
| 4,599,353 | A | 7/1986 | Bito |
| 4,812,457 | A | 3/1989 | Narumiya et al. |
| 4,839,342 | A | 6/1989 | Kaswan |
| 4,883,581 | A | 11/1989 | Dickakian |
| 4,888,354 | A | 12/1989 | Chang et al. |
| 4,889,845 | A | 12/1989 | Ritter et al. |
| 4,952,581 | A | 8/1990 | Bito et al. |
| 4,968,812 | A | 11/1990 | Wang et al. |
| 5,001,153 | A | 3/1991 | Ueno et al. |
| 5,194,429 | A | 3/1993 | Ueno et al. |
| 5,280,018 | A | 1/1994 | Ritter et al. |
| 5,288,754 | A | 2/1994 | Woodward et al. |
| 5,296,504 | A | 3/1994 | Stjernschantz et al. |
| 5,321,128 | A | 6/1994 | Stjernschantz et al. |
| 5,352,708 | A | 10/1994 | Woodward et al. |
| 5,422,368 | A | 6/1995 | Stjernschantz et al. |
| 5,422,369 | A | 6/1995 | Stjernschantz et al. |
| 5,431,881 | A | 7/1995 | Palacios |
| 5,474,979 | A | 12/1995 | Ding et al. |
| 5,480,900 | A | 1/1996 | DeSantis et al. |
| 5,508,303 | A | 4/1996 | Isogaya et al. |
| 5,510,383 | A | 4/1996 | Bishop et al. |
| 5,545,655 | A | 8/1996 | Friedlander et al. |
| 5,578,618 | A | 11/1996 | Stjernschantz et al. |
| 5,578,643 | A | 11/1996 | Hanson et al. |
| 5,607,978 | A | 3/1997 | Woodward et al. |
| 5,688,819 | A | 11/1997 | Woodward |
| 5,698,733 | A | 12/1997 | Hellberg et al. |
| 5,773,472 | A | 6/1998 | Stjernschantz et al. |
| 6,025,392 | A | 2/2000 | Selliah et al. |
| 6,124,344 | A | 9/2000 | Burk |
| 6,160,129 | A | 12/2000 | Burk |
| 6,232,344 | B1 | 5/2001 | Feng et al. |
| 6,254,860 | B1 | 7/2001 | Garst et al. |
| 6,258,844 | B1 | 7/2001 | Garst et al. |
| 6,262,105 | B1 | 7/2001 | Johnstone |
| 6,350,442 | B2 | 2/2002 | Garst |
| 6,403,649 | B1 | 6/2002 | Woodward |
| 6,441,047 | B2 | 8/2002 | DeSantis |
| 7,351,404 | B2 | 4/2008 | Woodward et al. |

| | | | |
|---|---|---|---|
| 7,368,436 | B2 | 5/2008 | Gleave et al. |
| 7,388,029 | B2 | 6/2008 | DeLong et al. |
| 8,038,988 | B2 | 10/2011 | Woodward et al. |
| 8,101,161 | B2 | 1/2012 | Woodward et al. |
| 2002/0044953 | A1 | 4/2002 | Michelet et al. |
| 2002/0103255 | A1* | 8/2002 | Hellberg et al. ............ 514/530 |
| 2002/0172693 | A1 | 11/2002 | DeLong et al. |
| 2003/0083381 | A1 | 5/2003 | Kumagai et al. |
| 2003/0147823 | A1 | 8/2003 | Woodward et al. |
| 2003/0199590 | A1 | 10/2003 | Cagle et al. |
| 2004/0052760 | A1 | 3/2004 | Michelet et al. |
| 2005/0222232 | A1 | 10/2005 | DeLong et al. |
| 2007/0078175 | A1 | 4/2007 | Boulle et al. |
| 2009/0018204 | A1 | 1/2009 | Brinkenhoff |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2174655 | 4/1995 |
| CA | 1339132 | 7/1997 |
| EP | 0170258 | 2/1986 |
| EP | 0249194 | 12/1987 |
| EP | 0308135 | 3/1989 |
| EP | 0639563 | 2/1995 |
| FR | 2239458 | 7/1973 |
| JP | S49-069636 | 7/1974 |
| JP | 61-218510 | 9/1986 |
| JP | H05-0331025 | 12/1993 |
| JP | H09-295921 | 11/1997 |
| JP | 10-287532 | 10/1998 |
| WO | 98-33497 | 8/1979 |
| WO | 89-03384 | 4/1989 |
| WO | 95-11003 | 4/1995 |
| WO | 97-31895 | 9/1997 |
| WO | 98-33497 | 8/1998 |
| WO | 99-12895 | 3/1999 |
| WO | 00-54810 | 9/2000 |
| WO | 01-74307 | 10/2001 |
| WO | 01-74315 | 10/2001 |
| WO | 2009-011744 | 1/2009 |
| WO | 2012-068515 | 5/2012 |

#### OTHER PUBLICATIONS

Abramovitz, Mark et al, The Utilization of Recombinant prostanoid Receptors to Determine the Affinities and Selectivities of Prostaglandins and Related Analogs, Biochimica et Biophysica Acta, 2000, 285-293, 1483.

Abramovitz, Mark, Cloning and Expressing of a cDNA for the Human prostanoid FP Receptor, Journal of Biological Chemistry, 1994, 2632-2636, 269(4).

Adis Data Information, ZD 6416, 2003.

Adis, Alprostadil (NexMed) Alprox-TDTM, BefarTM, FemproxTM, Prostaglandin E1 (NewMed), Adis R & D Profile, 1999, 413-414, 2(6), Adis International Limited.

Al-Sereiti, M.R., Pharmacology of Rosemary (Rosmarinus Officinalis Linn.) and its Therapeutic Potentials, Indian Journal of Experimental Biology, 1999, 124-130, 37.

Allenby, A.C. et al, Mechanism of Action of Accelerants on Skin Penetration, Br. J. Derm, 1969, 47-55, 81(Supp. 4).

Allergan Clinical Study Report, 192024-008, 2000.

Allergan, Inc., Dermatologic and Ophthalmic Drugs Advisory Committee Briefing Document for Bimatoprost Solution 0.03%, Dermatologic and Ophthalmic Drugs Advisory Committee Briefing Document for Bimatoprost Solution 0.03%, Oct. 29, 2008, 1-108.

Alm, Albert et al, Effects on Intraocular Pressure and Side Effects of 0.005% Latanoprost Applied Once Daily, Evening or Morning, Ophthalmology, 1995, 1743-1752, 102.

Alm, Albert et al, Phase III Latanoprost Studies in Scandinavia, the United Kingdom and the United States, Survey of Ophthalmology, Feb. 1997, S105-S110, 41(2).

Alm, Albert, Uveoscleral Outflow—A Review, Experimental Eye Research, 2009, 760-768, 88(4).

Alm, Albert, The Potential of Prostaglandin Derivates in Glaucoma Therapy, Current Opinion in Ophthalmology, 1993, 44-50, 4(11).

Audoly, Laurent et al, Identification of Specific EP Receptors Responsible for the Hemodynamic Effects of PGE2, Am. J. Physiol., 1999, H924-H930, 277.

(56)            **References Cited**

OTHER PUBLICATIONS

Badawy, Sherif et al, Salt Selection for Pharmaceutical Compounds, Preformulation in Solid Dosage Form Development (Informa Healthcare), 2008, 63-80, Chapter 2.3, Adeyeyem, Moji, ed.

Bartmann, W., Synthesis and Biological Activity, Luteolytic Prostaglandins, Feb. 1979, 301-311, 17(2).

Bastin, Richard et al, Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities, Organic Process Research & Development, 2000, 427-435, 4.

Bean, Gerald, Commercially Available Prostaglandin Analogs for the Reduction of Intraocular Pressure, Survey of Ophthalmology, 2008, S69-S84, 53 (Supp. 1).

Berge, Stephen M., Pharmaceutical Salts, Journal of Pharmaceutical Sciences, Jan. 1977, 1-19, 66 (1).

Berglund, Barbara et al, Investigation of Structural Analogs of Prostaglandin Amides for Binding to and Activation of CB1 and CB2 Cannabinoid Receptors in Rat Brain and Human Tonsils, Adv Exp Med Biol, 1999, 527-533, 469.

Bird, Katie, Nano Carriers Enhance Skin Penetration and Antioxidant Effect of CoQ10, Cosmetics design-asia.com, Apr. 8, 2010, 1 Page, William Reed Business Media SAS.

Bito, L.Z. et al, Long-Term Maintenance of Reduced Intraocular Pressure by Daily or Twice Daily Topical Application of Prostaglandins to Cat or Rhesus Monkey Eyes, Investigative Ophthalmology & Visual Science, 1983, 312-319, 24(3).

Bito, Laszlo, A new approach to the medical management of glaucoma, from the bench to the clinic, and beyond, Investigative Ophthalmology & Visual Science, 2001, 1126-1133, 42(6), The Proctor Lecture.

Brandt, James et al, Comparison of Once- or Twice-Daily Bimatoprost with Twice-Daily Timolol in Patients with Elevated IOP, American Academy of Ophthalmology, 2001, 1023-1031, 108(6).

Brandt, James, PA022 Phase III, 3-month Comparison in Timolol with AGN-192024: A New Ocular Hypotensive . Lipid for Glaucoma Management, Presented at 2000 Am. Acad. Ophthalmology, Ann. Mtg., Oct. 23, 2000, 1 Page.

Brubaker, Richard et al, Effects of AGN 192024, a new Ocular Hypotensive Agent, on Aqueous Dynamics, American journal of Ophthalmology, 2001, 19-24, 131(1).

Brundy, Gordon, Synthesis of 17-Phenyl-18, 19, 20-Trinorprostaglandins I. The PG1 Series, Prostaglandins, 1975, 1-4, 9(1).

Business Wire, Phase III Lumigan, AGN-192024—Data Presented at American Academy of Ophthalmology, American Academy of Ophthalmology, 2000, 1-3, Retrieved Dec. 14, 2010.

Cadet, Patrick et al, Molecular Identification and Functional Expression of µ3, a Novel Alternatively Spliced Variant of the Human µ Opiate Receptor Gene, J. Immunol., 2003, 5118-5123, 170.

Camras, Carl B. et al, Bimatoprost, the Prodrug of a Prostaglandin Analogue, Br J Ophthalmol, 2008, 862-863, 92.

Camras, Carl B. et al, Comparison of Latanoprost and Timolol in Patients with Ocular Hypertension and Glaucoma, Ophthalmology, 1996, 138-147, 103(1).

Camras, Carl B. et al, Detection of the Free Acid of Bimatoprost in Aqueous Humor Samples From Human Eyes Treated with Bimatoprost Before Cataract Surgery, The American Academy of Ophthalmology, 2004, 2193-2198, 7pg, n/a, American Academy of Ophthalmology.

Camras, Carl B. et al, Latanoprost, a prostaglandin Analog, for Glaucoma Therapy, Ophthalmology, 1996, 1916-1924, 103(11).

Camras, Carl B. et al, Multiple Dosing of Prostaglandin F2α or Epinephrine on Cynomolgus Monkey Eyes, Investigative Ophthalmology & Visual Science, Sep. 1988, 1428-1436, 29(9).

Camras, Carl B. et al, Multiple Dosing of Prostaglandin F2α or Epinephrine on Cynomolgus Monkey Eyes, Investigative Ophthalmology & Visual Science, 1987, 463-469, 28(3).

Camras, Carl B. et al, Multiple Dosing of Prostaglandin F2α or Epinephrine on Cynomolgus Monkey Eyes, Investigative Ophthalmology & Visual Science, 1987, 921-926, 28(6).

Camras, Carl B. et al, Reduction of Intraocular Pressure in Normal and Glaucomatous Primate (*Aotus trivirgatus*) Eyes by Topically Applied Prostaglandin F2α, Current Eye Research, 1981, 205-209, 1 (4).

Cantor, Louis et al, Levels of Bimatoprost Acid in the Aqueous Humour After Bimatoprost Treatment of Patients with Cataract, Br. J. Ophthalmol, 2007, 629-632, 91.

Cantor, Louis et al, Reply-Bimatoprost, the Prodrug of a Prostaglandin Analogue, Br J Ophthalmol, 2008, 863-864, 92.

CAS RN 155206-00-1 May 20, 1994.

Cayatte, Antonio et al, The Thromboxane A2 Receptor Antagonist, S18886, Decreases atherosclerotic Lesions and serum Intracellular Adhesion Molecule-1 in the Apo E Knockout Mouse, 71st Scientific Sessions, 1998, I-115 (Abstract), 98(17).

Chen, June et al, AGN 191129: A Neutral Prostaglandin F2n (PGF2n) Analog That Lacks the Mitogenic and Uterotonic Effects Typical of FP Receptor Agonists, Glaucoma, Anatomy & Pathology, Physiology & Pharmacology, 1999, 3562-B420, 40(4).

Chen, June et al, Replacement of the Carboxylic Acid Group of Prostaglandin F2α (PGF2α) with Certain Non-Ionizable Substituents Results in Pharmacologically Unique Ocular Hypotensive Agents, 11th Intl Conf. Advances Prostaglandin & Leukotriene Res.: Basic Sci. & New Clinical Applications—Abstract Book, 2000, 1 page.

Chen, June et al, Studies on the Pharmacology of Prostamide F2α, A Naturally Occurring Substance, Brit. J. Pharmacology, 2001, 63P, 133.

Chyun, Yong et al, Stimulation of Bone Formation by Prostaglandin E2, Prostaglandins, 1984, 97-103, 27(1).

Clissold, D., The Potential for Prostaglandin Pharmaceuticals, Lipids in Health and Nutrition, 1999, 115-129, 244, The Royal Society of Chemistry.

Cohen, Joel, Enhancing the Growth of Natural Eyelashes: The Mechanism of Bimatoprost-Induced Eyelash Growth, Dermatol Surg, 2010, 1361-1371, 36(9).

Coleman, Robert et al, Prostanoids and Their Receptors, Comprehensive Medicinal Chemistry, 1990, 643-714, 3.

Coleman, Robert, VIII. International union of Pharmacology Classification of Prostanoid Receptors: Properties, Distribution, and Structure of the Receptors and Their Subtypes, The American Society for Pharmacology and Experimental Therapeutics, 1994, 205-229, 26(2).

Collins, Paul et al, Synthesis of Therapeutically Useful Prostaglandin and Prostacyclin Analogs, Chem. Rev., 1993, 1533-1564, 93.

Colombe, Laurent et al, Prostaglandin metabolism in human hair follicle, Experimental Dermatology, May 16, 2007, 762-769, 16, US.

Corsini, A. et al, (5Z)-Carbacyclin Discriminates Between Prostacyclin-Receptors Coupled to Adenylate Cyclase in Vascular Smooth Muscle and Platelets, Br. J. Pharmac., 1987, 255-261, 90.

Cox, Colin et al, Protein Fabrication Automation, Protein Science, 2007, 379-390, 16.

Crowston, Jonathan et al, Effect of Bimatoprost on Intraocular Pressure in prostaglandin FP Receptor Knockout Mice, Investigative Ophthalmology & Visual Science, 2005, 4571-4577, 46.

Darnell, J., Cell-to-Cell Signaling: Hormones and Receptors, Molecular Cell Biology, 1990, 738-743, vol. 82, Darnell, J., Lidish, H., Baltimore, D., Eds., New York, New York.

Davies, Sean, Hydrolysis of Bimatoprost (Lumigan) to Its Free Acid by Ocular Tissue In Vitro, Journal of Ocular Pharmacology and Therapeutics, 2003, 45-54, 19(1).

De Asua, I. Jimenez et al, The Stimulation of the Initiation of DNA Synthesis and Cell Division in Swiss Mouse 3T3 Cells by Prostaglandin F2α Requires Specific Functional Groups in the Molecule, J. Biol. Chemistry, 1983, 8774-8780, 256(14).

Dean, T.R. et al, Improvement of Optic Nerve Head Blood Flow After One-Week Topical Treatment with Travoprost (AL06221) in the Rabbit, Investigative Ophthalmology & Visual Science, Mar. 15, 1999, 2688-B563, 40(4).

Del Toro, F. et al, Characterization of Prostaglandin E2 Receptors and Their Role in 24,25-(OH)2D3-Mediated Effects on Resting Zone Chondrocytes, Journal of Cellular Physiology, 2000, 196-208, 182.

Delong, Mitchell, Prostaglandin Receptor Ligands: Recent Patent Activity, IDrugs, 2000, 196-208, 3(9).

**US 8,926,953 B2**

Page 4

(56)                **References Cited**

OTHER PUBLICATIONS

Depperman, William, Up-To-Date Scalp Tonic, Book Reviews, 1970, 1115, 283(20).

Dirks, Monte et al, Efficacy and Safety of the Ocular Hypotensive Lipid™ 192024 in Patients with Elevated IOP: A 30-Day Comparison with Latanoprost, Investigative Ophthalmology & Visual Science, Mar. 15, 2000, S514, 41(4).

Dubiner, Harvey, Efficacy and Safety of Bimatoprost in Patients With Elevated Intraocular Pressure: a 30-Day Comparison With Latanoprost, Surv. Ophthalmol, 2001, S353-S560, 45 (4).

Easthope, Stephanie et al, Topical Bimatoprost, Drug Aging, 2002, 231-248, 19(3).

Eisenberg, Dan et al, A Preliminary Risk-Benefit Assessment of Latanoprost and Unoprostone in Open-Angle Glaucoma and Ocular Hypertension, Drug Safety, 1999, 505-514, 20(6).

Ellis, Cathy et al, Metabolism of Prostaglandin D2 in the Monkey, The Journal of Biological Chemistry, 1979, 4152-4163, 254(10).

Emu Oil Hairloss and Frontal Regrowth, 2010, 4 Pages, www. hairloss-research.org/blog/?p=73.

Enyedi, Laura et al, The Effectiveness of Latanoprost for the Treatment of Pediatric Glaucoma, J AAPOS, 1999, 33-39, 3(1).

Ezure, T. et al, Involvement of Sonic Hedgehog in Cyclosporine a Induced Initiation of Hair Growth, Journal of Dermatological Science, 2007, 168-170, 47.

Fagot, Dominique et al, Mitogenic Signaling by Prostaglandins in Chemically Transformed Mouse Fibroblasts: Comparison with Phorbol Esters and Insulin, Endocrinology, 1993, 1729-1734, 132(4).

Fall, P.M., Inhibition of Collagen Synthesis by Prostaglandins in the Immortalized Rat Ostroblastic Cell Line Pyla: Structure-Activity Relations and Signals Transduction Mechanisms, J. Bone Miner Res., 1994, 1935-1943, 9(12).

Fang, Jia-You et al, In Vitro and in Vivo Evaluations of the Efficacy and Safety of Skin Permeation Enhancers Using Flurbiprofen as a Model Drug, International Journal of Pharmaceutics, 2003, 153-166, 255.

Faulkner, Robert, Aqueous Humor Concentrations of Bimatoprost Free Acid, Bimatoprost and Travoprost Free Acid in Cataract Surgical Patients administered Multiple Topical Ocular Doses of Lumigan or Travatan, Journal of Ocular Pharmacology and Therapeutics, 2010, 147-156, 26(2).

FDA Approves Two New intraocular Pressure Lowering Drugs for the Management of Glaucoma, Mar. 16, 2001, FDA News.

FDA Label for Approved NDA 22-184 of Lumigan 0.01% and Lumigan 0.03%, Aug. 31, 2010.

Fiscella, Richard, Peek into the Drug Pipeline, Review of Optometry Online, Jan. 15, 2001, 5 pages.

Fitzpatrick, F.A., Separation of Prostaglandins and Thromboxanes by Gas Chromatography with Glass Capillary Columns, Analytical Chemistry, 1978, 47-52, 50(1).

Flisiak, Robert et al, Effect of Misoprostol on the Course of Viral Hepatitis B, Hepato-Gastroenterology, 1997, 1419-1425, 44.

Frenkel, R E et al, Evaluation of Circadian Control of Intraocular Pressure After a Single Drop of Bimatoprost 0.03% or Travoprost 0.004%, Curr. Med. Res. Opin., Apr. 2008, 919-923, 24(4).

Funk, Colin et al, Cloning and Expression of a cDNA for the Human Prostaglandin E Receptor EP1 Subtype*, The Journal of Biological Chemistry, Dec. 15, 1993, 26767-26772, 268(35).

Gandolfi, Stefano, Three-month Comparison of Bimatoprost and Latanoprost in Patients With Glaucoma and Ocular Hypertension, Adv. Ther, 2001, 110-121, 18.

Garadi, R et al, Travoprost: A New Once-Daily Dosed Prostaglandin for the Reduction of Elevated Intraocular Pressure, Investigative Ophthalmology & Visual Science, 1999, 4378-B181, Abstract Only.

Geng, Ling et al, Misoprostol, A PGE1 Analog That is Radioprotective for Murine Intestine and Hair, Induces Widely Different Cytokinetic Changes in These Tissues, The Journal of Investigative Dermatology, 1996, 858, 106(4).

Geng, Ling et al, Topical or Systemic 16,16 dm Prostaglandin E2 or WR-2721 (WR-1065) Protects Mice From Alopecia After Fractionated Irradiation, Int. J. Radiat. Biol., 1992, 533-537, 61(4).

Gerth, Jeff et al, Drug Makers Reap Profits on Tax-Backed Research, Apr. 23, 2000, 10 pages, New York Times.

Giuffre, Giuseppe, The Effects of Prostaglandin F2α in the Human Eye, Graefe's Archive Clin. & Exper. Ophthal., 1985, 139-141, 222.

Green Tea Consumption Grows Hair, Protects Against UV Radiation in Animal Models, 2010, 4 Pages, www.hairloss-research.org/blog/?p=4.

Grice, Jeffrey et al, Relative Uptake of Minoxidil into Appendages and Stratum Corneum and Permeation Through Human Skin in Vitro, Journal of Pharmaceutical Sciences, Feb. 2010, 712-718, 99(2).

Griffin, Brenda et al, AL-8810: A Novel Prostaglandin F2α Analog with Selective Antagonist Effects at the Prostaglandin F2α (FP) Receptor, Journal of Pharmacology and Experimental Therapeutics, 1999, 1278-1284, 290(3).

Grow (Verb) Definition, Merriam Webster's Dictionary, Retrieved from http://www.merriam-webster.com/dictionary/growing on Jul. 9, 2012.

Hall, Alistair et al, Clinprost Tijin, Current Opinion in Cardiovascular, Pulmonary & Renal Investigational Drugs, 1999, 605-610, 1(5).

Hallinan, Ann et al, Aminoacetyl Moiety as a Potential Surrogate for Diacylhydrazine Group of SC-51089, a Potent PGE2 Antagonist, and Its Analogs, J Med Chem, 1996, 609-613, 39.

Hanson, W R et al, 16,16 dm Prostaglandin2 Protects From Acute Radiation-Induced Alopecia in Mice, Clinical Research, 1988, 906A, 36(6).

Hanson, W R et al, Subcutaneous or Topical Administration of 16,16 Dimethyl Prostaglandin E2 Protects From Radiation-Induced Alopecia in Mice, Int. J. Radiation Oncology Biol. Phys., 1992, 333-337, 23.

Hartke, J.R. et al, Prostanoid FP Agonists Build Bone in the Ovariectomized Rat, Prostanoid FP Agonists Build Bone in the Ovariectomized Rat, 1999, S207.

Hayashi, Masaki et al, Prostaglandin Analogues Possessing Antinidatory Effects. 1. Modification of the ω Chain, J. Med. Chem., 1980, 519-524, 23.

Hecker, Markus et al, Studies on the Interaction of Minoxidil with Prostacyclin Synthase in Vitro, Biochemical Pharmacology, 1988, 3363-3365, 37(17).

Hellberg, Mark et al, The Hydrolysis of the Prostaglandin Analog Prodrug Bimatoprost to 17-Phenyltrinor PGF2α by Human and Rabbit Ocular Tissue, J. Ocular Pharmacol. Ther., 2003, 97-103, 19(2).

Higginbotham et al., One-Year, Randomized Study Comparing Bimatoprost and Timolol in Glaucoma and Ocular Hypertension, Archives of Opthalmology, Oct. 2002, 1286-1293, 120 (10).

Houssay, Alerto, Effects of Prostaglandins Upon Hair Growth in Mice, Acta Physiol. Latinoam., 1976, 186-191, 26.

Huang, A. et al, Different Modes of Inhibition of Increase in Cytosolic Calcium and Aggregation of Rabbit Platelets by Two Thromboxane A2 Antagonists, Asia Pacific Journal of Pharmacology, 1994, 163-171, 9.

Hulan, H.W. et al, The Development of Dermal Lesions and Alopecia in Male Rats Fed Rapeseed Oil, Canadian Journal of Physiology and Pharmacology, 1976, 1-6, 54(1).

Hulan, H.W. et al, The Effect of Long-Chain Monoenes on Prostaglandin E2 Synthesis by Rat Skin, Lipids, 1977, 604-609, 12(7).

Ichikawa, A. et al, Molecular Aspects of the Structures and Functions of the Prostaglandin E Receptors, J. Lipid Mediators Cell Signalling, 1996, 83-87, 14.

Informa UK Ltd., AGN-192024, 2006.

Inoue, Hironishi, Thromboxane A2 receptor antagonists, Oct. 1996, 1221-1225, 32(10), Pharmaceutical Society of Japan.

J Am Pharm Assoc-, Agents for Glaucoma, New Drugs of 2001, 2001, 4 pages, 42(2), Journal of the American Pharmaceutical Association, http://www.edscape.com/viewarticle/436631__22.

Jakobsson, Per-Johan et al, Membrane-Associated Proteins in Eicosanoid and Glutathione Metabolism (MAPEG), American Journal of Respiratory and Critical Care Medicine, 2000, S20-S24, 161.

**US 8,926,953 B2**

Page 5

(56)     **References Cited**

OTHER PUBLICATIONS

Jimenez, J.J. et al, Stimulated Monocyte-Conditioned Media Protect From Cytosine Arabinoside-Induced Alopecia in Rat, Friday Afternoon Subspecialty Meetings, 1990, 973A.

Johnstone, M.A., Brief Latanoprost RX Induces Hypertrichosis, Glaucoma Clinical Pharmacology II Poster Presentation, 1998, S258, 39(4).

Johnstone, Murray et al, Prostaglandin-Induced Hair Growth, Survey of Ophthalmology, Aug. 2002, S185-S202, 47(Suppl 1).

Johnstone, Murray, Hypertrichosis and Increased Pigmentation of Eyelashes and Adjacent Hair in the Region of the Ipsilateral Eyelids of Patients Treated With Unilateral Topical Latanoprost, American Journal of Ophthalmology, 1997, 544-547, 124(4).

Jordan, B.A. et al, G-Protein-Coupled Receptor Heterodimerization Modulates Receptor Function, Nature, Jun. 17, 1999, 697-700, 399(6737).

Karim, S.M. et al, Prostaglandins and Human Respiratory Tract Smooth Muscle: Structure Activity Relationship, Advances in Prostaglandin and Thromboxane Research, 1980, 969-980, 7.

Karuss, Achim et al, Evidence for Human Thromboxane Receptor Heterogeneity Using a Novel Series of 9,11-Cyclic Carbonate Derivatives of Prostaglandin F2α, British Journal of Pharmacology, 1996, 1171-1180, 117.

Katz, L.J. et al, Comparison of Human Ocular Distribution of Bimatoprost and Latanoprost, 2010, P450.

Kaufman, Paul, Effects of Intracamerally Infused Prostaglandins on Outflow Facility in Cynomolgus Monkey Eyes with Intact or Retrodisplaced Ciliary Muscle, Experimental Eye Research, 1986, 819-827, 43.

Kende, Andrew et al, Prostaglandin Phosphonic Acids Through Homolytic Halodecarboxylation of Prostaglandins F1α and F2α, Tetrahedron Letters, 1999, 8189-8192, 40.

Kerstetter, J.R. et al, Prostaglandin F2α-1-Isopropylester Lowers Intraocular Pressure Without Decreasing Aqueous Humor Flow, American Journal of Ophthalmology, 1988, 30-34, 105.

Kiriyama, Michitaka et al, Ligand Binding Specificities of the Eight Types and Subtypes of the Mouse Prostanoid Receptors Expressed in Chinese Hamster Ovary Cells, British Journal of Pharmacology, 1997, 217-224, 122.

Kluender, Harold et al al, The Synthesis of Dimethylphosphonoprostaglandin Analogs, Prostaglandins and Medicine, 1979, 441-444, 2.

Kreilgaard, MADS, Influence of Microemulsions on Cutaneous Drug Delivery, Advanced Drug Dellivery Reviews, 2002, S77-S98, 54 Suppl. 1.

Kvedar, Joseph et al, Topical Minoxidil in the Treatment of Male Pattern Alopecia, Pharmacotherapy, 1987, 191-197, 7(6).

Lachgar, S. et al, Effect of VEGF and Minoxidil on the Production of Arachidonic Acid Metabolites by Cultured Hair, Dermal Papilla Cells, Eur. J. Dermatol, 1996, 365-368, 6.

Lachgar, S. et al, Hair Dermal Papilla Cell Metabolism is Influenced by Minoxidil, Fundamental & Clinical Pharmacology, 1997, 178, 11(2).

Lachgar, S. et al, Modulation by Minoxidil and VEGF of the Production of Inflammatory Mediators by Hair Follicle Dermal Papilla Cells, Groupe de Rocherche Dermatologique, 1995, 161, 104(1).

Lambert, Joseph, Clinical Study Report, A Multicenter, Double-Masked, Randomized, Parallel, 3-Month study (with Treatment Extended to 1 year) of the Safety and Efficacy of AGN 192024 0.03% Ophthalmic Solution Administered Once-Daily or Twice-daily Compared with Timolol 0.5% Ophthalmic Solution Administered Twice-Daily in Subjects with Glaucoma or Ocular Hypertension, Study No. 192024-009, Phase 3, 1998, 34 pages, Allergan, Inc.

Lardy, C. et al, Antiaggregant and Antivasospastic Properties of the New Thromboxane A2 Receptor Antagonist Sodium 4-[[1-[[[(4 Chlorophenyl)sulfonyl]amino]methyl]cyclopentyl]methyl]benzeneacetate, Arzneim.-Forsch./Drug Res., 1994, 1196-1202, 44(11).

Lee, Ping-Yu et al, The Effect of Prostaglandin F2α on Intraocular Pressure in Mormotensive Human Subjects, Investigative Ophthalmology & Visual Science, Oct. 1988, 1474-1477, 29(10).

Lee, Vincent et al, Improved Ocular Drug Delivery with Prodrugs, Prodrugs: Topical and Ocular Drug Delivery, 1992, 221-297, Kenneth Sloan Edition.

Liang, Y. et al, Identification and Pharmacological Characterization of the Prostaglandin FP Receptor and FP Receptor Variant Complexes, Br. J. Pharmacol., 2008, 1079-1093, 154.

Liljebris, Charlotta et al, Derivatives of 17-Phenyl-18,19,20-trinorprostaglandin F2α Isopropyl Ester: Potential Antiglaucoma Agents, J. Med. Chem., 1995, 289-304, 38.

Ling, Geng et al, 16,16 dm Prostaglandin E2 Protects Mice From Fractionated Radiation-Induced Alopecia, Clinical Research, 1990, 858A, 38(3).

Lumigan 6-Month Phase 3 Data Presented at American Glaucoma Society Meeting, Mar. 2, 2001, 4 pages, Business Wire.

Lumigan Package Insert, Mar. 2001, 6 pages, NDA 21-275.

Lundy, M.W. et al, Restoration of Cancellous Architecture and Increased Bone Strength in Aged Osteopenic Rats Treated with Fluprostenol, 21st Annual Meeting of the American Society for Bone and Mineral Research, 1999, S401.

Maddox, Yvonne et al, Amide and I-amino Derivatives of F Prostaglandins as Prostaglandin Antagonists, Nature, Jun. 15, 1978, 549-552, 273.

Malkinson, Frederick et al, Prostaglandins Protect Against Murine Hair Injury Produced by Ionizing Radiation of Doxorubicin, J. Invest. Dermatol., 1993, 135S-137S, 101.

Mansberger, Steven et al, Eyelash Formation Secondary to Latanoprost Treatment in a Patient With Alopecia, Arch. Opthalmol., 2000, 718-719, 118.

Maruyama, Takayuki et al, EP1 Receptor Antagonists Suppress Tactile Allodynia in Rats, Prostaglandins & Other Lipid Mediators, 1999, 217(Abstract), 59.

Matsumura, H. et al, Brain and Neuroscience, 1998, 79-89.

Maurer, Marcus et al, Hair Growth Modulation by Topical Immunophilin Ligands, American Journal of Pathology, Apr. 1997, 1433-1441, 150(4).

Maw, Graham, Chapter 8. Pharmacological Therapy for the Treatment of Erectile Dysfunction, Annual Reports in Medicinal Chemistry, 1999, 71-80.

Maxey, Kirk, The Hydrolysis of Bimatoprost in Corneal Tissue Generates a Potent Prostanoid FP Receptor Agonist, Survey of Ophthalmology, Aug. 2002, S34-S40, 47 (Supp. 1).

McCullough, Peter et al, Ridogrel Janssen, Current Opinion in Anti-inflammatory & Immunodulatory Investigational Drugs, 1999, 265-276, 1(3).

McMurry, John, Amides, Organic Chemistry, 1984, 794.

Medical Review, Application No. 21-275, Center for Drug Evaluation and Research, 2001.

Medline, Bimatoprost (Ophthalmic), Bimatoprost, Jul. 24, 2001, 4 pages, Medlineplus. Health Information, Online.

Michelet, Jean-Francois et al, Activation of Cytoprotective Prostaglandin Synthase-1 by Minoxidil as a Possible Explanation for Its Hair Growth-Stimulating Effect, J. Invest. Dermatol., 1997, 205-209, 108.

Mihele, Densia et al, Cercetarea Actiunii Hepatoprotectoare a Unor Prostaglandine De Sinteza, Farmacia, 1999, 43-58, 67(5).

Millikan, Larry, Treatment of Alopecia, The Journal of Clinical Pharmacology, 1987, 715, 27(8).

Millikan, Larry, Treatment of Male Pattern Baldness, Drug Therapy, 1989, 62-73.

Mishima, Hiromu, A Comparison of Latanoprost and Timolol in Primary Open-Angle Glaucoma and Ocular Hypertension, Arch. Opthalmol., 1996, 929-932, 114.

Miyamoto, Terumasa et al, A Comparison in the Efficacy and Safety Between Ramatroban (BAY u 3405) and Ozagrel-HCl for Bronchial Asthma—A Phase III, Multi-Center, Randomized, Double-Blind, Group Comparative Study, 1997, 599-639.

Mori, S. et al, Effects of Prostaglandin E2 on Production of New Cancellous Bone in the Axial Skeleton of Ovariectomized Rats, Bone, 1990, 103-113, 11.

Muller-Rover, Sven et al, A Comprehensive Guide for the Accurate Classification of Murine Hair Follicles in Distinct Hair Cycle Stages, J. Invest. Dermatol, 2001, 3-15, 117.

A18

**US 8,926,953 B2**

Page 6

(56)     **References Cited**

OTHER PUBLICATIONS

Mura, Simona et al, Penetration Enhancer-Containing Vesicles (PEVs) as Carriers for Cutaneous Delivery of Minoxidil, International Journal of Pharmaceutics, 2009, 72-79, 380.

Murakami, T. et al, Effect of Isocarbacyclin Methyl Ester Incorporated in Lipid Microspheres on Experimental Models of Peripheral Obstructive Disease, Drug Res., 1990, 991-994, 45(9).

Narumiya, Shuh et al, Roles of Prostanoids in Health and Disease; Lessons From Receptor-Knockout Mice, Common Disease: Genetic and Pathogenetic Aspects of Multifactorial Diseases, 1999, 261-269.

Neau, Steven, Pharmaceutical Salts, Water-Insoluble Drug Formulation, 2008, 417-435.

Negishi, Manabu et al, Molecular Mechanisms of Diverse Actions of Prostanoid Receptors, Biochimica et Biophysica Acta, 1995, 109-120, 1259.

New Drugs for Glaucoma, FDA Consumer Magazine, May-Jun. 2001.

Norrdin, R.W. et al, The Role of Prostaglandins in Bone in Vivo, Prostaglandins Leukotrienes and Essential Fatty Acids, 1990, 139-149, 41.

Olsen, Elise et al, Transdermal Viprostol in the Treatment of Male Pattern Baldness, J. Am. Acad. Dermatol., 1990, 470-472, 23.

Orlicky, D.J., Negative Regulatory Activity of a Prostaglandin F2$\alpha$ Receptor Associated Protein (FPRP), Prostaglandins, Leukotrienes and Essential Fatty Acids, 1996, 247-259, 54(4).

Ortonne, Jean-Paul et al, Hair Melanin's Hair Color: Ultrastructural and Biochemical Aspects, Journal of the Society for Investigative Dermatology, 1993, 82S-89S.

Paragraph IV Letter, Jul. 26, 2010.

Paus, Ralf et al, The Induction of Anagen Hair Growth in Telogen Mouse Skin by Cyclosporine A Administration, Laboratory Investigation, 1989, 365-369, 60(3).

Pfeiffer, N, New Developments in Glaucoma Drug Therapy, Ophthalmologist, 1992, W1-W13, 89.

Pharmaprojects No. 6321, 2006, 1 page.

Phase 3 Lumigan—AGN 192024—Data Presented at American Academy of Ophthalmology, Allergan Press Release, Mar. 1, 2000.

Physicians' Desk Reference, 56th ed., pp. 212-13, 543, 553-54, 2864-65 (2002).

Poyer, J. F. et al, Prostaglandin F2$\alpha$ Effects on Isolated Rhesus Monkey Ciliary Muscle, Invest. Ophthalmol. Vis. Sci., Nov. 1995, 2461-2465, 36(12).

Preparation of '404 Patent Documents for European Patent Office; Defendant Athena Cosmetics, Inc., Supplemental Invalidity Contentions Pursuant to Patent Local Rule 3-3, 2009.

Preparation of '404 Patent Documents for European Patent Office; Defendant Peter Thomas Roth Labs LLC and Peter Thomas Roth, Inc.'s Invalidity Contentions Pursuant to Patent Local Rule 3-3, 2009.

Preparation of '404 Patent Documents for European Patent Office; Defendants Metrics LLC, Product Innovations LLC; Stella International LLC; and Nutra-Luxe, M.D. LLC's; Local Patent Rule 3-3 Preliminary Invalidity Contentions, 2009.

Preparation of '404 Patent Documents for European Patent Office; Invalidity Contentions Pursuant to Patent Local Rule 3-3, 2008.

Rampton, D.S. et al, Anti-inflammatory Profile in Vitro of Ridogrel, A Putative New Treatment for Inflammatory Bowel Disease, Immunology, Microbiology, and Inflammatory Disorders, 1999, G3477.

Resul, B et al, Phenyl-substituted Prostaglandins: Potent and Selective Antiglaucoma Agents, J. Med. Chem., Jan. 22, 1993, 243-248, 36(2).

Reynolds, A, Darkening of Eyelashes in a Patient Treated With Latanoprost, Eye, 1998, 741-743, 12.

Rigaudy, J. et al, Nomenclature of Organic Chemistry Sections A, B. C, D, E, F, and H, InCl. Union of Pure & Applied Chemistry, Organic Chemistry Div., Comm'n. On Nomenclature of Organic Chemistry, 1979, 255-256.

Roenigk, Henry, New Topical Agents for Hair Growth, Clinics in Dermatology, 1988, 119-121, 6(4).

Romano, Maria Rosaria et al, Evidence for the Involvement of Cannabinoid DB1 Receptors in the Bimatoprost-Induced Contractions on the Human Isolated Ciliary Muscle, Investigative Ophthalmology & Visual Science, Aug. 2007, 3677-3382, 48(8).

Roof, S.L. et al, mRNA Expression of Prostaglandin Receptors EP1, EP2, EP3 and EP4 in Human Osteoblast-Like Cells and 23 Human Tissues, 18 Annual Meeting of the American Society for Bone and Mineral Research, 1996, S337.

Roseborough, Ingrid et al, Lack of Efficacy of Topical Latanoprost and Bimatoprost Ophthalmic Solutions in Promoting Eyelash Growth in Patients with Alopecia Areata, J Am Acad Dermtol, Apr. 2009, 705-706, 60(4).

Ruel, Rejean et al, New Class of Biphenylene Dibenzazocinones as Potent Ligands for the Human EP1 Prostanoid Receptor, Bioorganic & Medicinal Chemistry Letters, 1999, 2699-2704, 9.

Saeki, Hideshisa et al, Guidelines for Management of Atopic Dermatitis, Journal of Dermatology, 2009, 563-577, 36.

Sakuma, Yoko et al, Crucial Involvement of the EP4 Subtype of Prostaglandin E Receptor in Osteoclast Formation by Proinflammatory Cytokines and Lipopolysaccharide, Journal of Bone and Mineral Research, 2000, 218-227, 15(2).

Sauk, John et al, Influence of Prostaglandins E1, E2, and Arachidonate on Melanosomes in Melanocytes and Keratinocytes of Anagen Hair Bulbs in Vitro, The Journal of Investigative Dermatology, 1975, 332-337, 64.

Scheider, Marlon et al, The Hair Follicle as a Dynamic Miniorgan, Current Biology, 2009, R132-R142, 19.

Sharif, N. A. et al, [3H]AL-5848 ([3H]9$\beta$-(+)-Fluprostenol). Carboxylic Acid of Travoprost (AL-6221), a Novel FP Prostaglandin o Study the Pharmacology and Autoradiographic Localization of the FP Receptor, J. Pharm. Pharmacol., 1999, 685-694, 51.

Sharif, N.A. et al, Cat Iris Sphincter Smooth-Muscle Contraction: Comparison of FP-Class Prostaglandin Analog Agonist Activities, J. Ocul. Pharmacol. Ther., Apr. 2008, 152-163, 24(2).

Sharif, N.A. et al, Human Ciliary Muscle Cell Responses to FP-class Prostaglandin Analogs: Phosphoinositide Hydrolysis, Intracellular Ca2+ Mobilization and MAP Kinase Activation, J. Ocul. Pharmacol Ther., 2003, 437-455, 19.

Sharif, N.A. et al, Human Trabecular Meshwork cell Responses Induced by Bimatoprost, Travoprost, Unoprostone, and Other FP Prostaglandin Receptor Agonist Analogues, Invest. Ophthalmol Vis. Sci., 2003, 715-721, 44.

Sharif, N.A. et al, Ocular Hypotensive FP Prostaglandin (PG) Analogs: PG Receptor Subtype Binding Affinities and Selectivities, and Agonist Potencies at FP and Other PG Receptors in Cultured Cells, Journal of Ocular Pharmacology and Therapeutics, 2003, 501-515, 19(6).

Sharif, N.A. et al, Update and Commentary on the Pro-Drug Bimatoprost and a Putative Prostamide Receptor, Expert Rev. Ophthalmol., 2009, 477-489, 4(5).

Sharif, Najam, Bimatoprost and Its Free Acid are Prostaglandin FP Receptor Agonists, European Journal of Pharmacology, 2001, 211-213, 432.

Sherwood, Mark et al, Six-Month Comparison of Bimatoprost Once-Daily and Twice-Daily with Timolol Twice-Daily in Patients with Elevated Intraocular Pressure, Survey of Ophthalmology, 2001, S361-S368, 45(4).

Shih, Mei-Shu et al, PGE2 Induces Regional Remodeling Changes in Haversian Envelope: a Histomorphometric Study of Fractured Ribs in Beagles, Bone and Mineral, 1986, 227-264, 1.

Shimazaki, Atsushi et al, Effects of the New Ethacrynic Acid Derivative SA9000 on Intraocular Pressure in Cats and Monkeys, Biol. Pharm. Bull., 2004, 1019-1024, 27(7).

Shimazaki, Atsushi et al, New Ethacrynic Acid Derivatives as Potent Cytoskeletal Modulators in Trabecular Meshwork Cells, Bio. Pharm. Bull., 2004, 846-850, 27(6).

Sjoquist, Birgitta et al, Ocular and Systemic Pharmacokinetics of Latanoprost in Humans, Surv. Ophthalmol., Aug. 2002, S6-S12, 47(Suppl 1).

**US 8,926,953 B2**

Page 7

(56)    **References Cited**

OTHER PUBLICATIONS

Sjoquist, Birgitta et al, Pharmacokinetics of Latanoprost in the Cynomolgus Monkey. 3rd Communication: Tissue Distribution After Topical Administration on the Eye Studied by Whole Body Autoradiography, Glaucoma Research Laboratories. Arzneim-Forsch/Drug Res., 1999, 240-249, 49.

Sorbera, L.A. et al, Travoprost, Drugs of the Future, 2000, 41-45, 25(1).

Souillac, Pierre et al, Characterization of Delivery Systems, Differential Scanning Calorimetry, 1999, 212-227, 49.

Spada, C.S. et al, Bimatoprost and Prostaglandin F2α Selectively Stimulate Intracellular Calcium Signaling in Different Cat iris Sphincter Cells, Exp. Eye Res., Jan. 2005, 135-145, 80(1).

Sredni, Benjamin et al, The Protective Role of the Immunomodulator AS101 Against Chemotherapy-Induced Alopecia Studies on Human and Animal Models, Int. J. Cancer, 1996, 97-103, 65.

Stahl, Heinrich et al, Chapter 12: Monographs on Acids and Bases, Handbook of Pharmaceutical Salts, 2008, 265-327.

Stamer, W.D. et al, Cellular Basis for Bimatoprost Effects on Human Conventional Outflow, Invest. Ophthalmol. Vis. Sci., Oct. 2010, 5176-5181, 51(10).

Stjernschantz, Johan et al, From PGF2α-isopropyl Ester to Latanoprost: A Review of the Development of Xalatan: The Proctor Lecture, Invest. Ophthalmol. Vis. Sci., May 2001, 1134-1145, 42(6).

Stjernschantz, Johan et al, Phenyl Substituted Prostaglandin Analogs for Glaucoma Treatment, Phenyl Substituted Prostaglandin Analogs for Glaucoma Treatment, 1992, 691-704, 17(8).

Stjernschantz, Johan et al, Studies on Ocular Inflammation and Development of a Prostaglandin Analogue for Glaucoma Treatment, Exp. Eye Res., Apr. 2004, 759-766, 78(4).

Supplement A (Lumigan®), Physician's Desk Reference 2001, Mar. 2001.

Swarbrick, James et al, Salt Forms of Drugs and Absorption, Encyclopedia of Pharmaceutical Technology, 1988, 453-499, 13.

Terada, Nobuhisa et al, Effect of a Thromboxane A2 Receptor Antagonist Ramatroban (BAY u 3405), on Inflammatory Cells, Chemical Mediators and Non-Specific Nasal Hyperreactivity After Allergen Challenge in Patients with Perennial Allergic Rhinitis, Allergoloy International, 1998, 59-67, 47.

The Newsletter of Glaucoma Foundation, 2000, 11 pages, 11(2).

Titus, Reuben, Aloe Vera—The Magical Plant Amongst Us, 2009, 12 Pages, http://www.scribd.com/doc/19139862/Aloe-VeraMiracle-Plant.

Tobin, Desmond, Aging of the Hair Follicle Pigmentation System, Int. J. Trichology, Jul.-Dec. 2009, 83-93, 1(2).

Tomita, Yasushi et al, Melanocyte-Stimulating Properties of Arachidonic Acid Metabolites: Possible Role in Postinflammatory Pigmentation, Pigment Cell Research, 1992, 357-361, 5.

Topical Emu Oil and Coconut Oil for Hair Loss—A Potent Combination, 2010, 3 Pages, www.hairloss-research.org/blog/?p=15.

Tosti, Antonella et al, Hypertrichosis of the Eyelashes Caused by Bimatoprost, J Am Acad Dermatol, Nov. 2004, S149-S150, 51(5).

TRAVATAN (travoprost ophthalmic solution) 0.004% Product Insert, NDA 21-257, Mar. 16, 2001, 7 Pages.

U.S. Appl. No. 11/805,122, Resp. to Office Action dated Jan. 21, 2009.

Ueda, Ken et al, Cortical Hyperostosis Following Long-Term Administration of Prostaglandin E1 in Infants with Cyanotic Congenital Heart Disease, Journal of Pediatrics, 1980, 834-836, 97(5).

Uno, Hideo et al, Effect of Latanoprost on Hair Growth in the Bald Scalp of the Stump-Tailed Macacque: A Pilot Study, Acta Derm Venereol, 2002, 7-12, 82.

Van Alphen, G.W.H.M. et al, The effect of Prostaglandins on the Isolated Internal Muscles of the Mammalian Eye, Including Man, Documenta Ophthalmologica, 1977, 397-415, 42(4).

Vandenburg, A.M. et al, A One-Month Dose Response Study of AGN 192024, A Novel Antiglaucoma Agent, in Patients with Elevated Intraocular Pressure, Glaucoma Clinical Pharmacology IV Poster Presentation, 1999, S830, 40 (4).

Vandenburgh, Amanda, reply to Alan L. Robin, An Accurate Comparison of Bimatoprost's Efficacy and Adverse Effects, Arch Ophthalmol, Jul. 2002, 997-1000, 120.

Vayssairat, Michael, Preventive Effect of an Oral prostacyclin Analog, Beraprost Sodium, on Digital Necrosis in Systemic Sclerosis, J. Rheumatol, 1999, 2173-2178, 26.

Vengerovsky, A.I. et al, Hepatoprotective action of prostaglandins, Experimental and Clinical Pharmacology, 1997, 78-82, 60(5).

Verbeuren, T. et al, The TP-Receptor Antagonist S 18886 Unmasks Vascular Relaxation and Potentiates the Anti-Platelet Action of PGD2, New Antithrombotic Agents, Jun. 11, 1997, 693.

Verma, DD et al, Treatment of Alopecia Areata in the DEBR Model Using Cyclosporin A Lipid Vesicles, Eur. J. Dermatol, 2004, 332-338, 14.

Vielhauer, G.A. et al, Cloning and Localization of hFP(S): a Six-Transmembrane mRNA Splice Variant of the Human FP Prostanoid Receptor, Arch Biochem Biophys., Jan. 15, 2004, 175-185, 421(2).

Villumsen, J. et al, Prostaglandin F2α-isopropylester Eye Drops: Effect on Intraocular Pressure in Open-Angle Glaucoma, Br. J. Ophthalmol., 1989, 975-979, 73.

Vincent, J.E. et al, Letter to the Editor Prostaglandin Synthesis and Selenium Deficiency a Hypothesis, Prostaglandins, 1974, 339-340, 8(4).

Vippagunta, Sudha et al, Crystalline Solids, Advanced Drug Delivery Reviews, 2001, 3-26, 48.

Voss, N. G. et al, Induction of Anagen Hair Growth in Telogen Mouse Skin by Topical Latanoprost Application, Glaucoma Pharmacology, Cellular, Mechanism II, Mar. 15, 1999, S676, 40(4).

Waddell, K.A. et al, Combined Capillary Column Gas Chromatography Negative Ion Chemical Ionization Mass Spectrometry of Prostanoids, Biomedical Mass Spectrometry, 1983, 83-88, 10(2).

Wand, Martin, Latanoprost and Hyperpigmentation of Eyelashes, Arch Ophthalmology, Sep. 1997, 1206-1208, 115.

Wang, Yili et al, Design and Synthesis of 13,14-Dihydro Prostaglandin F1α Analogues as Potent and Selective Ligands for the Human FP Receptor, J. Med. Chem., 2000, 945-952, 43.

Watson, Peter et al, A Six-month, Randomized, Double-masked Study Comparing Latanoprost with Timolol in Open-Angle Glaucoma and Ocular Hypertension, Ophthalmology, 1996, 126-137, 103.

Whitcup, A Multi-Center, Investigator-Marked, Randomized, Parallel Study of the Safety and Efficacy of AGN 192024 0.03% Ophthalmic Solution Compared with Latanoprost 0.005% Ophthalmic Solution Administered Once-Daily in Subjects with Glaucoma or Ocular Hypertension, Study No. 192024-010-01, Phase 3b, 1999, 1.

White, J.H. et al, Heterodimerization is Required for the Formation of a Functional GABA(B) Receptor, Nature, Dec. 17, 1998, 679-682, 396(6712).

Whitson, Jess, Travoprost—a New Prostaglandin Analogue for the Treatment of Glaucoma, Expert Opin. Pharmacother, 2002, 965-977, 3 (7).

Willis, Anthony, Prostaglandins and Related Lipids, vol. I, Chemical and Biochemical Aspects, CRC Handbook of Eicosanoids, 1987, 80-97, 1.

Wilson, S.J. et al, Dimerization of the Human Receptors for Prostacyclin and Thromboxane Facilitates Thromboxane Receptor-Mediated CAMP Generation, J. Biol. Chem., Dec. 17, 2004, 53036-53047, 279(51).

Woodward, David et al, Bimatoprost Effects on Aqueous Humor Dynamics in Monkeys, J. Ophthalmol., 2010, 1-5, vol. 2010.

Woodward, David et al, Bimatoprost: a Novel Antiglaucoma Agent, Cardiovascular Drug Reviews, 2004, 103-120, 22(2).

Woodward, David et al, Emerging Evidence for Additional Prostanoid Receptor Subtypes, Current Topics in Pharmacology, 1998, 153-162, 4.

Woodward, David et al, Identification of an antagonist that selectively blocks the activity of prostamides (prostaglandin-ethanolamides) in the feline iris, British Journal of Pharmacology, 2007, 342-352, 150.

Woodward, David et al, Molecular Characterization and Ocular Hypotensive Properties of the Prostanoid EP2 Receptor, Journal of Ocular Pharmacology, 1995, 447-454, 11(3).

(56)          **References Cited**

OTHER PUBLICATIONS

Woodward, David et al, Prostaglandin F2α (PGF2α) 1-Ethanolamide: A Unique Local Hormone Biosynthesized From Anandamide, 11th Intl Conf. Advances Prostaglandin & Leukotriene Res.: Basic Sci. & New Clinical Applications—Abstract Book 27, 2000, 1 page.

Woodward, David et al, Replacement of Carboxylic Acid Group of Prostaglandin F2α with a Hydroxyl or Methoxy Substituent Provides Biologically Unique Compounds, British Journal of Pharmacology, Aug. 2000, 1933-1943, 130(8).

Woodward, David et al, Studies on the Ocular Effects of Pharmacologically Novel Agent Prostaglandin F2α 1-OCH3 (AGN 191129), Eicosanoids, 1998, R719.

Woodward, David et al, The Pharmacology of Bimatoprost (LumiganTM), Surv Ophthalmol, 2001, S337-S345, Suppl 4.

Woodward, David, Pharmacological Characterization of a Novel Antiglaucoma Agent, Bimatoprost (AGN 192024), J. Pharmacol. Exp. Ther., Jan. 24, 2003, 772-785, 305 (2).

Xalatan (Latanoprost Ophthalmic Solution) 0.005% Product Insert, 2001, 4 Pages.

Xalatan ® Eye Drops, Retrieval Date : Oct. 2, 2010, 3 pages, http://home.intekom.com/pharm/pharmaca/xalatan.html.

Yamaji, K. et al, Prostaglandins E1 and E2, but not F2α or Latanoprost, Inhibit Monkey Ciliary Muscle Contraction, Curr. Eye Res., 0812005, 661-665, 30(8).

Zeigler, Tania, Old Drug New Use: New Research Shows Common Cholesterol-Lowering Drug Reduces Multiple Sclerosis Symptoms in Mice, National Institute of Neurological Disorders and Stroke, Jan. 6, 2003, 2 Pages.

Zimbric, M.L. et al, Effects of Latanoprost of Hair Growth in the Bald Scalp of Stumptailed Macaques, Glaucoma Pharmacology, Cellular Mechanism II, 1999, 3569-B427—Abstract, vol. 40, No. 4.

United States Court of Appeals for the *Federal Circuit, Allergan, Inc., and Duke University* v. *Apotex Inc., Apotex Corp., Sandoz, Inc., and Hi-Tech Pharmacal Co., Inc.*, 2014, 41 Pages.

* cited by examiner

**U.S. Patent**                    Jan. 6, 2015                    **US 8,926,953 B2**



1

# METHOD OF ENHANCING HAIR GROWTH

## RELATED APPLICATIONS

This patent application is a continuation of U.S. patent application Ser. No. 13/441,783, filed Apr. 6, 2012, which is a continuation of U.S. patent application Ser. No. 13/356,284, filed Jan. 23, 2012, now U.S. Pat. No. 8,263,054, issued Sep. 9, 2011, which is a continuation of U.S. patent application Ser. No. 12/425,933, filed Apr. 17, 2009, now U.S. Pat. No. 8,298,518, issued Oct. 30, 2012, which is a continuation of U.S. patent application Ser. No. 11/943,714, filed Nov. 21, 2007, now U.S. Pat. No. 8,038,988, issued Oct. 18, 2011, which is a continuation of U.S. patent application Ser. No. 11/805,122, filed May 22, 2007, now U.S. Pat. No. 8,101,161, issued Jan. 24, 2012, which is a continuation of U.S. patent application Ser. No. 10/345,788, which was filed on Jan. 15, 2003, now U.S. Pat. No. 7,351,404, issued Apr. 1, 2008, which claims the benefit of U.S. Provisional Application No. 60/354,425, filed on Feb. 4, 2002, all of which are hereby incorporated by reference herein.

## FIELD OF THE INVENTION

This invention relates to a method for stimulating the growth of mammalian hair comprising the application to mammalian skin of a cyclopentane heptanoic acid, 2-cycloalkyl or arylalkyl derivative or a pharmacologically acceptable acid addition salt thereof, alone, or in association with a topical pharmaceutical carrier.

## BACKGROUND OF THE INVENTION

Dermatologists recognize many different types of hair loss, the most common by far being "alopecia" wherein human males begin losing scalp hair at the temples and on the crown of the head as they get older. While this type of hair loss is largely confined to males, hence its common name "male pattern baldness," it is not unknown in women. No known cure has yet been found despite continuing attempts to discover one.

A good deal is known about various types of human hair and its growth patterns on various parts of the body.

For purposes of the present invention, it is necessary to consider various types of hair, including, terminal hairs and vellus hairs and modified terminal hairs, such as seen in eye lashes and eye brows. Terminal hairs are coarse, pigmented, long hairs in which the bulb of the hair follicle is seated deep in the dermis. Vellus hairs, on the other hand, are fine, thin, non-pigmented short hairs in which the hair bulb is located superficially in the dermis. As alopecia progresses, a transition takes place in the area of approaching baldness wherein the hairs themselves are changing from the terminal to the vellus type.

Another factor that contributes to the end result is a change in the cycle of hair growth.

All hair, both human and animal, passes through a life cycle that includes three phases, namely, the anagen phase, the catagen phase and the telogen phase. The anagen phase is the period of active hair growth and, insofar as scalp hair is concerned, this generally lasts from 3-5 years. The catagen phase is a short transitional phase between the anagen and telogen phases which, in the case of scalp hair, lasts only 1-2 weeks. The final phase is the telogen phase which, for all practical purposes, can be denominated a "resting phase" where all growth ceases and the hair eventually is shed preparatory to the follicle commencing to grow a new one. Scalp

2

hair in the telogen phase is also relatively short-lived, some 3-4 months elapsing before the hair is shed and a new one begins to grow.

Under normal hair growth conditions on the scalp, approximately 88% of the hairs are in the anagen phase, only 1% in catagen and the remainder in telogen. With the onset of male pattern baldness, a successively greater proportion of the hairs are in the telogen phase with correspondingly fewer in the active growth anagen phase.

Alopecia is associated with the severe diminution of hair follicles. A bald human subject will average only about 306 follicles per square centimeter, whereas, a non-bald human in the same age group will have an average of 460 follicles per square centimeter. This amounts to a one-third reduction in hair follicles which, when added to the increased proportion of vellus hair follicles and the increased number of hair follicles in the telogen phase, is both significant and noticeable. Approximately 50% of the hairs must be shed to produce visible thinning of scalp hair. It is thus a combination of these factors: transition of hairs from terminal to vellus, increased number of telogen hairs—some of which have been shed, and loss of hair follicles that produces "baldness".

While a good deal is known about the results of male pattern baldness, very little is known about its cause. The cause is generally believed to be genetic and hormonal in origin although, the known prior art attempts to control it through hormone adjustment have been singularly unsuccessful.

One known treatment for male pattern alopecia is hair transplantation. Plugs of skin containing hair are transplanted from areas of the scalp where hair is growing to bald areas with reasonable success; however, the procedure is a costly one in addition to being time-consuming and quite painful. Furthermore, the solution is inadequate from the standpoint that it becomes a practical, if not an economic, impossibility to replace but a tiny fraction of the hair present in a normal healthy head of hair.

Other non-drug related approaches to the problem include such things as ultra-violet radiation, massage, psychiatric treatment and exercise therapy. None of these, however, has been generally accepted as being effective. Even such things as revascularization surgery and acupuncture have shown little, if any, promise.

By far, the most common approach to the problem of discovering a remedy for hair loss and male pattern alopecia has been one of drug therapy. Many types of drugs ranging from vitamins to hormones have been tried and only recently has there been any indication whatsoever of even moderate success. For instance, it was felt for a long time that since an androgenic hormone was necessary for the development of male pattern baldness, that either systemic or topical application of an antiandrogenic hormone would provide the necessary inhibiting action to keep the baldness from occurring. The theory was promising but the results were uniformly disappointing.

The androgenic hormone testosterone was known, for example, to stimulate hair growth when applied topically to the deltoid area as well as when injected into the beard and pubic regions. Even oral administration was found to result in an increased hair growth in the beard and pubic areas as well as upon the trunk and extremities. While topical application to the arm causes increased hair growth, it is ineffective on the scalp and some thinning may even result. Heavy doses of testosterone have even been known to cause male pattern alopecia.

Certain therapeutic agents have been known to induce hair growth in extensive areas of the trunk, limbs and even occa-

US 8,926,953 B2

**3**

sionally on the face. Such hair is of intermediate status in that it is coarser than vellus but not as coarse as terminal hair. The hair is generally quite short with a length of 3 cm. being about maximum. Once the patient ceases taking the drug, the hair reverts to whatever is normal for the particular site after six months to a year has elapsed. An example of such a drug is diphenylhydantoin which is an anticonvulsant drug widely used to control epileptic seizures. Hypertrichosis is frequently observed in epileptic children some two or three months after starting the drug and first becomes noticeable on the extensor aspects of the limbs and later on the trunk and face. (The same pattern of hypertrichosis is sometimes caused by injury to the head.) As for the hair, it is often shed when the drug is discontinued but may, in some circumstances, remain.

Streptomycin is another drug that has been found to produce hypertrichosis, in much the same way as diphenylhydantoin, when administered to children suffering from tuberculous meningitis. About the same effects were observed and the onset and reversal of the hypertrichosis in relation to the period of treatment with the antibiotic leave little question but that it was the causative agent.

Two treatments have been demonstrated as showing some promise in reversing male pattern alopecia. These treatments include the use of a microemulsion cream containing both estradiol and oxandrolone as its active ingredients and the use of organic silicon. In addition to the foregoing, it has been reported in U.S. Pat. Nos. 4,139,619 and 4,968,812 that the compound minoxidil is useful for the treatment of male pattern baldness. That compound, among others, has proven to have considerable therapeutic value in the treatment of severe hypertension. It is a so-called "vasodilator" which, as the name implies, functions to dilate the peripheral vascular system. Dermatologists and others have recognized that prolonged vasodilation of certain areas of the human body other than the scalp sometimes result in increased hair growth even in the absence of any vasodilating therapeutic agent. For instance, increased hair growth around surgical scars is not uncommon. Similarly, arteriovenous fistula have been known to result in increased vascularity accompanied by enhanced hair growth. Externally-induced vasodilation of the skin, such as, for example, by repeated tilting of the limbs by the mentally retarded and localized stimulation of the shoulders by water carries has been known to bring on hypertrichosis in the affected areas. Be that as it may, similar techniques such as continued periodic massage of the scalp have been found to be totally ineffective as a means for restoring lost hair growth to the scalp. Scar tissue on the scalp inhibits rather than promotes hair growth.

U.S. Pat. No. 6,262,105 to Johnstone suggests that prostaglandins and derivatives thereof are useful in a method of enhancing hair growth.

Bimatoprost, which is sold by Allergan, Inc. of Irvine, Calif., U.S.A. as Lumigan® ophthalmic solution for treating glaucoma now has been found as being effective to increase the growth of eyelashes when applied in the FDA approved manner.

It is, therefore, a principal object of the present invention to provide a novel and effective treatment for the stimulation of hair growth and the treatment of male pattern baldness.

Another object of the invention is to provide a method of stimulating hair growth in humans and non-human animals that is compatible with various types of therapeutic agents or carriers and, therefore, would appear to be combinable with those which, by themselves, demonstrate some therapeutic activity such as, for example, microemulsion creams or topical compositions containing estradiol and oxandrolone,

**4**

minoxidil or agents that block the conversion of testosterone to dihydrotesterone (Procipia).

Still another objective is the provision of a treatment for the stimulation of hair growth which, while effective for its intended purpose, is apparently non-toxic and relatively free of unwanted side effects.

An additional object of the invention herein disclosed and claimed is to provide a method for treating hair loss in men or women which can be applied by the patient under medical supervision no more stringent than that demanded for other topically-administered therapeutic agents.

Other objects of the invention are to provide a treatment for male pattern alopecia which is safe, simple, painless, cosmetic in the sense of being invisible, easy to apply and quite inexpensive when compared with hair transplants and the like.

## SUMMARY OF THE INVENTION

This invention provides pharmaceutical compositions for topical application to enhance hair growth comprising an effective amount of a cyclopentane heptanoic acid, 2-cycloalkyl or arylalkyl compound represented by the formula I



wherein the dashed bonds represent a single or double bond which can be in the cis or trans configuration, A is an alkylene or alkenylene radical having from two to six carbon atoms, which radical may be interrupted by one or more oxa radicals and substituted with one or more hydroxy, oxo, alkyloxy or akylcarboxy groups wherein said alkyl radical comprises from one to six carbon atoms; B is a cycloalkyl radical having from three to seven carbon atoms, or an aryl radical, selected from the group consisting of hydrocarbyl aryl and heteroaryl radicals having from four to ten carbon atoms wherein the heteroatom is selected from the group consisting of nitrogen, oxygen and sulfur atoms; X is $—N(R^4)_2$ wherein $R^4$ is selected from the group consisting of hydrogen, a lower alkyl radical having from one to six carbon atoms,



wherein $R^5$ is a lower alkyl radical having from one to six carbon atoms; Z is $=O$; one of $R_1$ and $R_2$ is $=O$, $—OH$ or a $—O(CO)R_6$ group, and the other one is $—OH$ or $—O(CO)R_6$, or $R_1$ is $=O$ and $R_2$ is H, wherein $R_6$ is a saturated or unsaturated acyclic hydrocarbon group having from 1 to about 20 carbon atoms, or $—(CH_2)_mR_7$ wherein m is 0 or an integer of from 1 to 10, and $R_7$ is cycloalkyl radical, having from three to seven carbon atoms, or a hydrocarbyl aryl or heteroaryl radical, as defined above in free form or a pharmaceutically acceptable salt thereof, in association with a pharmaceutical carrier adapted for topical application to mammalian skin.

Preferably, the compound is a cyclopentane heptanoic acid, 2-(phenyl alkyl or phenyloxyalkyl) represented by the formula II

US 8,926,953 B2

**5**



wherein y is 0 or 1, x is 0 or 1 and x and y are not both 1, Y is a radical selected from the group consisting of alkyl, halo, e.g. fluoro, chloro, etc., nitro, amino, thiol, hydroxy, alkyloxy, alkylcarboxy, halo substituted alkyl wherein said alkyl radical comprises from one to six carbon atoms, etc. and n is 0 or an integer of from 1 to 3 and $R_3$ is =O, —OH or —O(CO)$R_6$ wherein $R_6$ is as defined above or a pharmaceutically acceptable salt thereof.

More preferably the compound is a compound of formula III.



wherein hatched lines indicate α configuration, solid triangles are used to indicate β configuration.

More preferably y is 1 and x is 0 and $R_1$, $R_2$ and $R_3$ are hydroxy.

Most preferably the compound is cyclopentane N-ethyl heptanamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5-dihydroxy, [$1_\alpha$,$2_\beta$,$3_\alpha$,$5_\alpha$], also known as bimatoprost. Another aspect of the invention provides methods for stimulating the rate of hair growth and for stimulating the conversion of vellus hair or intermediate hair to growth as terminal hair in a human or non-human animal by administering to the skin of the animal an effective amount of a compound wherein the compound has the formula:



wherein the dashed bonds represent a single or double bond which can be in the cis or trans configuration, A is an alkylene or alkenylene radical having from two to six carbon atoms, which radical may be interrupted by one or more oxa radicals and substituted with one or more hydroxy, oxo, alkyloxy or akylcarboxy groups wherein said alkyl radical comprises from one to six carbon atoms; B is a cycloalkyl radical having from three to seven carbon atoms, or an aryl radical, selected from the group consisting of hydrocarbyl aryl and heteroaryl radicals having from four to ten carbon atoms wherein the heteroatom is selected from the group consisting of nitrogen, oxygen and sulfur atoms; X is —N($R^4$)$_2$ wherein $R^4$ is

**6**

selected from the group consisting of hydrogen, a lower alkyl radical having from one to six carbon atoms,



wherein $R^5$ is a lower alkyl radical having from one to six carbon atoms; Z is =O; one of $R_1$ and $R_2$ is =O, —OH or a —O(CO)$R_6$ group, and the other one is —OH or —O(CO)$R_6$, or $R_1$ is =O and $R_2$ is H, wherein $R_6$ is a saturated or unsaturated acyclic hydrocarbon group having from 1 to about 20 carbon atoms, or —(CH$_2$)mR$_7$ wherein m is 0 or an integer of from 1 to 10, and $R_7$ is cycloalkyl radical, having from three to seven carbon atoms, or a hydrocarbyl aryl or heteroaryl radical, as defined above in free form or a pharmaceutically acceptable salt thereof.

These and other aspects of the invention will become apparent from the description of the invention which follows below.

### BRIEF DESCRIPTION OF THE DRAWING FIGURE

The FIGURE shows the effect on the eyelashes of one patient treated for glaucoma with Lumigan® bimatoprost for six months.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Alopecia (baldness) a deficiency of either normal or abnormal hair, is primarily a cosmetic problem in humans. It is a deficiency of terminal hair, the broad diameter, colored hair that is readily seen. However, in the so-called bald person although there is a noticeable absence of terminal hair, the skin does contain vellus hair which is a fine colorless hair which may require microscopic examination to determine its presence. This vellus hair is a precursor to terminal hair. In accordance with the invention as described herein, compounds represented by



wherein $R_1$, $R_2$, A, B, Z and X are defined above, can be used to stimulate, such as stimulating the conversion of vellus hair to growth as terminal hair as well as increasing the rate of growth of terminal hair.

The present invention was discovered as follows:

In the course of treating patients having glaucoma, treatment may only be appropriate in one eye. Within the course of daily practice it was discovered that a patient who been treated with bimatoprost has lashes that were longer, thicker and fuller in the treated eye than in the non-treated eye. On examination the difference was found to be very striking The lashes were longer and had a more full dense appearance in the treated eye. The lash appearance on the lids of the treated eye would have appeared quite attractive if it represented a bilateral phenomenon. Because of its asymmetric nature, the

US 8,926,953 B2

**7**

long lashes on one side could be construed as disturbing from a cosmetic standpoint. Because of the very unusual appearance a systematic examination of other patients who were taking bimatoprost in only one eye was made. It soon became apparent that this altered appearance was not an isolated finding. Comparison of the lids of patients who were taking bimatoprost in only one eye revealed subtle changes in the lashes and adjacent hairs of the bimatoprost-treated side in several patients. Definite differences could be identified to varying degrees in the lashes and adjacent hairs of all patients who were taking the drug on a unilateral basis for longer than 6 months.

These findings were totally unexpected and surprising. Minoxidil is thought to stimulate hair growth by its ability to cause vasodilation suggesting that agents with such a capability may be uniquely effective in stimulating hair growth. The finding that bimatoprost, which, as explained below, is not a prostaglandin derivative, such as latanoprost stimulates hair growth is especially surprising and unexpected.

The changes in the lashes were apparent on gross inspection in several patients once attention was focused on the issue. In those with light colored hair and lashes, the differences were only seen easily with the aid of the high magnification and lighting capabilities of the slit lamp biomicroscope. In the course of a glaucoma follow up examination, attention is generally immediately focused on the eye itself. Because of the high power magnification needed only one eye is seen at a time and the eye is seen at a high enough power that the lashes are not in focus. At these higher powers, any lash asymmetry between the two eyes is not likely to be noticed except by careful systematic comparison of the lashes and adjacent hairs of the eyelids of the two eyes.

Observed parameters leading to the conclusion that more robust hair growth occurred in the treated area following administration of bimatoprost were multiple. They included increased length of lashes, increased numbers of lashes along the normal lash line, increased thickness and luster of lashes, increased auxiliary lash-like terminal hair in transitional areas adjacent to areas of normal lash growth, increased lash-like terminal hairs at the medial and lateral canthal area, increased pigmentation of the lashes, increased numbers, increased length, as well as increased luster, and thickness of fine hair on the skin of the adjacent lid, and finally increased perpendicular angulation of lashes and lash-like terminal hairs. The conclusion that hair growth is stimulated by bimatoprost is thus supported not by evidence of a difference in a single parameter but is based on multiple parameters of hair appearance in treated vs. control areas in many subjects. This finding is entirely unexpected and represents a previously unrecognized effect of bimatoprost on stimulation of hair follicles. The modified hairs of the lashes normally turn over slowly and are in their resting phase longer than hair on, for example, the scalp. The ability to cause differences in appearance of lashes, the ability to stimulate conversion of vellus or intermediate hair to terminal hairs in transitional areas and the ability to stimulate growth of vellus hair on the skin indicates that bimatoprost is a diversely effective and efficacious agent for the stimulation of hair growth. Thus, the present invention provides a treatment by bimatoprost of hair of the scalp, eyebrows, beard and other areas that contain hair that results in increased hair growth in the corresponding areas.

Patients that are treated in or around the eye with compounds of the invention, such as bimatoprost, regularly develop hypertrichosis including altered differentiation, numbers, length, thickness, curvature and pigmentation in the region of treatment.

**8**

Some examples of representative compounds useful in the practice of the present invention include the compounds shown in Table 1:

TABLE 1

cyclopentane heptenamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane N,N-dimethylheptenamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane heptenylamide-5-cis-2-(3α-hydroxy-4-meta-chlorophenoxy-1-trans-pentenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane heptenylamide-5-cis-2-(3α-hydroxy-4-trifluoromethylphenoxy-1-trans-pentenyl)-3, 5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane N-isopropyl heptenamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane N-ethyl heptenamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5 dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane N-methyl heptenamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

cyclopentane heptenamide-5-cis-2-(3α-hydroxy-4-meta-chlorophenoxy-1-trans-butenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$]

One presently preferred compound for use in the practice of the present invention is cyclopentane N-ethyl heptanamide-5-cis-2-(3α-hydroxy-5-phenyl-1-trans-pentenyl)-3,5-dihydroxy, [1$_\alpha$,2$_\beta$,3$_\alpha$,5$_\alpha$], also known as bimatoprost and sold under the name of Lumigan® by Allergan, Inc., California, USA. This compound has the following structure:



The synthesis of the above compounds described above has been disclosed in U.S. Pat. No. 5,607,978. This patent also shows, particularly in Examples 1, 2, 5 and 7 that these compounds are not prostaglandins, in that they do not behave as prostaglandins in art-recognized assays for prostaglandin activity. The invention thus relates to the use of the above compounds, or prodrugs of the active compounds, for treatment for the stimulation of hair growth. As used herein, hair growth includes hair associated with the scalp, eyebrows, eyelids, beard, and other areas of the skin of animals.

In accordance with one aspect of the invention, the compound is mixed with a dermatologically compatible vehicle or carrier. The vehicle which may be employed for preparing compositions of this invention may comprise, for example, aqueous solutions such as e.g., physiological salines, oil solutions or ointments. The vehicle furthermore may contain dermatologically compatible preservatives such as e.g., benzalkonium chloride, surfactants like e.g., polysorbate 80, liposomes or polymers, for example, methyl cellulose, polyvinyl alcohol, polyvinyl pyrrolidone and hyaluronic acid; these may be used for increasing the viscosity. Furthermore, it is also possible to use soluble or insoluble drug inserts when the drug is to be administered.

The invention is also related to dermatological compositions for topical treatment for the stimulation of hair growth which comprise an effective hair growth stimulating amount of one or more compounds as defined above and a dermatologically compatible carrier. Effective amounts of the active compounds may be determined by one of ordinary skill in the art but will vary depending on the compound employed,

US 8,926,953 B2

9

frequency of application and desired result, and the compound will generally range from about 0.0000001 to about 50%, by weight, of the dermatological composition, preferably. from about 0.001 to about 50%, by weight, of total dermatological composition, more preferably from about 0.1 to about 30%, by weight of the composition.

The present invention finds application in all mammalian species, including both humans and animals. In humans, the compounds of the subject invention can be applied for example, to the scalp, face, beard, head, pubic area, upper lip, eyebrows, and eyelids. In animals raised for their pelts, e.g., mink, the compounds can be applied over the entire surface of the body to improve the overall pelt for commercial reasons. The process can also be used for cosmetic reasons in animals, e.g., applied to the skin of dogs and cats having bald patches due to mange or other diseases causing a degree of alopecia.

The pharmaceutical compositions contemplated by this invention include pharmaceutical compositions suited for topical and local action.

The term "topical" as employed herein relates to the use of a compound, as described herein, incorporated in a suitable pharmaceutical carrier, and applied at the site of thinning hair or baldness for exertion of local action. Accordingly, such topical compositions include those pharmaceutical forms in which the compound is applied externally by direct contact with the skin surface to be treated. Conventional pharmaceutical forms for this purpose include ointments, liniments, creams, shampoos, lotions, pastes, jellies, sprays, aerosols, and the like, and may be applied in patches or impregnated dressings depending on the part of the body to be treated. The term "ointment" embraces formulations (including creams) having oleaginous, water-soluble and emulsion-type bases, e.g., petrolatum, lanolin, polyethylene glycols, as well as mixtures of these.

Typically, the compounds are applied repeatedly for a sustained period of time topically on the part of the body to be treated, for example, the eyelids, eyebrows, skin or scalp. The preferred dosage regimen will generally involve regular, such as daily, administration for a period of treatment of at least one month, more preferably at least three months, and most preferably at least six months.

For topical use on the eyelids or eyebrows, the active compounds can be formulated in aqueous solutions, creams, ointments or oils exhibiting physiologically acceptable osmolarity by addition of pharmacologically acceptable buffers and salts. Such formulations may or may not, depending on the dispenser, contain preservatives such as benzalkonium chloride, chlorhexidine, chlorobutanol, parahydroxybenzoic acids and phenylmercuric salts such as nitrate, chloride, acetate, and borate, or antioxidants, as well as additives like EDTA, sorbitol, boric acid etc. as additives. Furthermore, particularly aqueous solutions may contain viscosity increasing agents such as polysaccharides, e.g., methylcellulose, mucopolysaccharides, e.g., hyaluronic acid and chondroitin sulfate, or polyalcohol, e.g., polyvinylalcohol. Various slow releasing gels and matrices may also be employed as well as soluble and insoluble ocular inserts, for instance, based on substances forming in-situ gels. Depending on the actual formulation and compound to be used, various amounts of the drug and different dose regimen may be employed. Typically, the daily amount of compound for treatment of the eyelid may be about 0.1 ng to about 100 mg per eyelid.

For topical use on the skin and the scalp, the compound can be advantageously formulated using ointments, creams, liniments or patches as a carrier of the active ingredient. Also, these formulations may or may not contain preservatives, depending on the dispenser and nature of use. Such preser-

10

vatives include those mentioned above, and methyl-, propyl-, or butyl-parahydroxybenzoic acid, betain, chlorhexidine, benzalkonium chloride, and the like. Various matrices for slow release delivery may also be used. Typically, the dose to be applied on the scalp is in the range of about 0.1 ng to about 100 mg per day, more preferably about 1 ng to about 10 mg per day, and most preferably about 10 ng to about 1 mg per day depending on the compound and the formulation. To achieve the daily amount of medication depending on the formulation, the compound may be administered once or several times daily with or without antioxidants.

The invention is further illustrated by the following non-limiting examples:

### EXAMPLE 1

In Vivo Treatment

A study is initiated to systematically evaluate the appearance of lashes and hair around the eyes of patients who are administering bimatoprost in only one eye. The study involves 10 subjects, 5 male, 5 female, average age 70 years, (ranging from 50-94 years). All patients have glaucoma. Each subject is treated daily by the topical application of one drop of bimatoprost at a dosage of 1.5 .mu.g/ml/eye/day (0.03%, by weight, ophthalmic solution, sold under the name Lumigan® by Allergan, Irvine, Calif., U.S.A.) to the region of one eye by instilling the drop onto the surface of the eye. The region of the fellow control eye is not treated with bimatoprost and served as a control.

In the course of treatment with eye drops, there is typically spontaneous tearing, and excess fluid from the drops and associated tears gathers at the lid margins. In the course of wiping the drug containing fluid from the lid margins and adjacent lid, a thin film of the fluid is routinely spread to contact the adjacent skin of the lid area. This widespread exposure of the skin around the lid to the effect of drops is regularly demonstrated in patients who develop a contact dermatitis. Typically the entire area of the upper and lower lid are involved with induration, erythema and edema demonstrating the regular extensive exposure of the ocular adnexa to the influence of topically applied drugs.

The study is limited to subjects who have administered bimatoprost to one eye for more than 3 months. The mean duration of exposure to bimatoprost prior to assessing the parameter of lash growth between the control and study eye is 129 days (range 90-254 days). Observations are made under high magnification at the slit lamp biomicroscope. Documentation of differences between the control and treatment areas is accomplished using a camera specially adapted for use with the slit lamp biomicroscope.

The results of the observations are as follows:

Length of lashes: Increased length of eyelashes is regularly observed on the side treated with bimatoprost. The difference in length varies from approximately 10% to as much as 30%.

Number of lashes: Increased numbers of lashes are observed in the treated eye of each patient. In areas where there are a large number of lashes in the control eye, the increased number of lashes in the bimatoprost-treated eye gave the lashes on the treated side a more thickly matted overall appearance.

Auxiliary lash-like hair growth: Several patients have an apparent increase in lash-like hair in transitional areas adjacent to areas of normal lash distribution. These prominent robust appear lash-like hairs appeared to be of comparable length to the actual lashes. These long, thick lash-like hairs were present in the central portion of the lids of several patients in a linear arrangement just above the lash line. Hairs

US 8,926,953 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

are present at similar locations in the control eyes but are by contrast thinner or more fine in appearance, have less luster and pigment and are more flat against the skin of the lid typical of vellus or intermediate hairs. In several patients, lash-like terminal hairs grow luxuriantly in the medial canthal area in the treated eye. In the corresponding control eye, vellus hairs are seen at the same location. Lash-like hairs are also present in the lateral canthal area of the treated eye but not the control eye in several subjects. Large lashes are not normally present at the lateral canthus and the area is generally free of all but a few occasional very fine lashes or vellus hairs.

Increased growth of vellus hair on lids: Fine microscopic vellus hair is present on the skin of the lids and is easily seen with the slit lamp biomicroscope. This vellus hair is typically denser adjacent to the lateral portion of the lower lids. While remaining microscopic, vellus hairs are increased in number, appear more robust and are much longer and thicker in treated than in control eyes in the areas below and lateral to the lower lid.

Perpendicular angulation of hairs: In areas where there are lash-like hairs above the lash line and in the medial and lateral canthal areas, the hairs are much longer, thicker and heavier. They also leave the surface of the skin at a more acute angle, as though they are stiffer or held in a more erect position by more robust follicles. This greater incline, pitch, rise or perpendicular angulation from the skin surface gives the appearance of greater density of the hairs.

The foregoing observations clearly establish that bimatoprost can be used to increase the growth of hair in man. This conclusion is based on the regular and consistent finding of manifestations of increased hair growth in treated vs. control areas in human subjects. The conclusion that the drug bimatoprost is capable of inducing increased robust growth of hair is based not on a single parameter, i.e., length, but is based on multiple lines of evidence as described in the results. Detailed examination and description of multiple parameters of differences in hair is greatly facilitated by the ability to examine the hairs at high magnification under stable conditions of fixed focal length and subject position utilizing the capabilities of the slitlamp biomicroscope.

The FIGURE shows the actual results on the eyelashes of a patient treated for glaucoma with Lumigan® bimatoprost for 6 months.

EXAMPLE 2

Topical Cream

A topical cream is prepared as follows: Tegacid and spermaceti are melted together at a temperature of 70-80° C. Methylparaben is dissolved in about 500 gm of water and propylene glycol, polysorbase 80, and bimatoprost are added in turn, maintaining a temperature of 75-80° C. The methylparaben mixture is added slowly to the Tegacid and spermaceti melt, with constant stirring. The addition is continued for at least 30 minutes with additional stirring until the temperature has dropped to 40-45° C. Finally, sufficient water is added to bring the final weight to 1000 gm and the preparation stirred to maintain homogeneity until cooled and congealed.

EXAMPLE 3

Topical Cream

A topical cream is prepared as follows: Tegacid and spermaceti are melted together at a temperature of 70-80° C. Methylparaben is dissolved in water and propylene glycol, polysorbate 80, and bimatoprost are added in turn, maintaining a temperature of 75-80° C. The methylparaben mixture is added slowly to the Tegacid and spermaceti melt, with constant stirring. The addition is continued for at least 30 minutes with additional stirring until the temperature has dropped to 40-45° C. Finally, sufficient water is added to bring the final weight to 1000 gm and the preparation stirred to maintain homogeneity until cooled and congealed.

The composition is applied to bald human scalp once daily to stimulate the growth of hair.

EXAMPLE 4

Topical Ointment

An ointment containing 2% by weight bimatoprost is prepared as follows:

White petrolatum and wool fat are melted, strained and liquid petrolatum is added thereto. The bimatoprost, zinc oxide, and calamine are added to the remaining liquid petrolatum and the mixture milled until the powders are finely divided and uniformly dispersed. The mixture is stirred into the white petrolatum, melted and cooled with stirring until the ointment congeals.

The foregoing ointment can be applied topically to mammalian skin for increased rate of hair growth, and can be prepared by omitting the zinc oxide and calamine.

EXAMPLE 5

Ointment

A dermatological ophthalmic ointment containing 10% by weight bimatoprost is prepared by adding the active compound to light liquid petrolatum. White petrolatum is melted together with wool fat, strained, and the temperature adjusted to 45-50° C. The liquid petrolatum slurry is added and the ointment stirred until congealed. Suitably the ointment is packaged in 30 gm tubes.

The foregoing ointment can be applied to the eyelid to enhance the growth of eyelashes. Similarly the composition can be applied to the brow for eyebrow growth.

EXAMPLE 6

Solution

An aqueous solution containing 5%, by weight, bimatoprost is prepared as follows. Bimatoprost is dissolved in water and the resulting solution is sterilized by filtration. The solution is aseptically filled into sterile containers.

The composition so prepared can be used in the topical treatment of baldness by application to the scalp daily.

EXAMPLE 7

Lotion

A sample of bimatoprost is dissolved in the vehicle of N-methyl pyrrolidone and propylene glycol. The composition can be used for application to dogs or cats having hair loss due to mange or alopecia of other causes.

EXAMPLE 8

Aerosol

An aerosol containing approximately 0.1% by weight bimatoprost is prepared by dissolving the bimatoprost in absolute alcohol. The resulting solution filtered to remove particles and lint. This solution is chilled to about minus 30° C. To the solution is added a chilled mixture of dichlorodifluoromethane and dichlorotetrafluoroethane.

US 8,926,953 B2

**13**

Thirteen ml plastic-coated amber bottles are cold filled with 11.5 gm each of the resulting solution and capped.

The composition can be sprayed on the scalp daily to stimulate the growth of hair.

EXAMPLE 9

Dusting Powder

A powder of the compound bimatoprost is prepared by mixing in dry form with talcum powder at a weight/weight ratio of 1:10. The powdered mixture is dusted on the fur of minks or other commercially valuable fur bearing animals and show animals for increased rate of hair growth.

EXAMPLE 10

Related Compounds

Following the procedure of the preceding Examples, compositions are similarly prepared substituting an equimolar amount of a compound of Table 1 for the bimatoprost disclosed in the preceding Examples. Similar results are obtained.

While the preferred embodiment of the invention has been illustrated and described, it will be appreciated that various changes can be made therein without departing from the spirit and scope of the invention.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

**1**. A method of enhancing the growth of one selected from the group consisting of eyelashes, eyebrows and scalp hair, wherein the method comprises topical application of a bimatoprost composition.

**2**. The method of claim **1**, wherein the composition is a bimatoprost solution.

**3**. The method of claim **2**, wherein the composition is a 0.03% w/v bimatoprost solution.

**4**. The method of claim **1**, wherein the method is for use in enhancing the growth of eyelashes.

**5**. The method of claim **3**, wherein the method is useful for the treatment of hypotrichosis of the eyelashes.

**6**. The method of claim **5**, wherein the composition increases one attribute selected from the group consisting of length, thickness and darkness of eyelashes.

**7**. The method of claim **5**, wherein the composition increases at least two attributes selected from the group consisting of length, thickness and darkness of eyelashes.

**14**

**8**. The method of claim **5**, wherein the composition increases the length, thickness and darkness of eyelashes.

**9**. The method of claim **1**, wherein the composition is applied directly to where eyelash, eyebrow or scalp hair growth is needed.

**10**. A method for use in enhancing the growth of one selected from the group consisting of eyelashes, eyebrows and scalp hair, comprising tropically applying at least once a day a composition comprising bimatoprost.

**11**. The method of claim **10**, wherein the composition contains 0.001-50% w/v bimatoprost.

**12**. The method of claim **10**, wherein the composition contains 0.03% w/v bimatoprost.

**13**. The method of claim **10**, wherein the composition contains 0.1%-30% w/v bimatoprost.

**14**. The method of claim **10**, wherein the composition is a 0.03% w/v bimatoprost solution and is useful for treating hypotrichosis of the eyelashes by increasing one attribute selected from the group consisting of length, thickness and darkness of eyelashes.

**15**. The method of claim **10**, wherein the composition is 0.03% w/v bimatoprost solution and is used for enhancing the growth of eyelashes.

**16**. The method of claim **15**, wherein the composition is applied once a day to the upper eyelid margin.

**17**. The method of claim **10**, wherein the composition is applied directly to the scalp to enhance hair growth.

**18**. The method of claim **10**, wherein the composition is applied directly to the skin beneath the eyebrows to enhance eyebrow growth.

**19**. The method of claim **10**, wherein the composition is an emulsion.

**20**. The method of claim **10**, wherein the composition is selected from the group consisting of a solution, an emulsion, a foam, a gel and a cream.

**21**. The method of claim **14**, wherein the attribute is length.

**22**. The method of claim **14**, wherein the attribute is thickness.

**23**. The method of claim **14**, wherein the attribute is darkness.

**24**. The method of claim **6**, wherein the attribute is length.

**25**. The method of claim **6**, wherein the attribute is thickness.

**26**. The method of claim **6**, wherein the attribute is darkness.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.              : 8,926,953 B2                          Page 1 of 2
APPLICATION NO.    : 13/937512
DATED                     : January 6, 2015
INVENTOR(S)          : David F. Woodward et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page, item (56),

On the page 2, in column 2, under "Other Publications", line 15, delete "Acclerants" and insert

-- Accelerants --, therefor.

On the page 2, in column 2, under "Other Publications", line 30, delete "Derivates" and insert

-- Derivatives --, therefor.

On the page 4, in column 1, under "Other Publications", line 29, delete "Ostroblastic" and insert

-- Osteoblastic --, therefor.

On the page 4, in column 2, under "Other Publications", line 26, delete "Prostaglandin2" and insert

-- Prostaglandin E2 --, therefor.

On the page 4, in column 2, under "Other Publications", line 47, delete "Opthalmology," and insert

-- Ophthalmology, --, therefor.

On the page 5, in column 1, under "Other Publications", line 43, delete "Dellivery" and insert

-- Delivery --, therefor.

On the page 5, in column 1, under "Other Publications", line 68, delete "Mormotensive" and insert

-- Normotensive --, therefor.

On the page 5, in column 2, under "Other Publications", line 27, delete "Opthalmol.," and insert

-- Ophthalmol., --, therefor.

On the page 5, in column 2, under "Other Publications", line 62, delete "Opthalmol.," and insert

-- Ophthalmol., --, therefor.

On the page 6, in column 2, under "Other Publications", line 20, delete "Lipopolysacharide," and

insert -- Lipopolysaccharide, --, therefor.

On the page 6, in column 2, under "Other Publications", line 30, delete "o" and insert -- to --, therefor.

Signed and Sealed this
Nineteenth Day of May, 2015

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**                                    Page 2 of 2
**U.S. Pat. No. 8,926,953 B2**

In the Specification

In column 1, lines 8-9, delete "Sep. 9, 2011," and insert -- Sep. 11, 2012, --, therefor.

In column 4, line 39, delete "akylcarboxy" and insert -- alkylcarboxy --, therefor.

In column 5, line 61, delete "akylcarboxy" and insert -- alkylcarboxy --, therefor.

In column 6, line 53, delete "$R_2$," and insert -- $R_2$, --, therefor.

In column 6, line 63, delete "striking" and insert -- striking. --, therefor.

In column 7, line 35, delete "bimatroprost" and insert -- bimatoprost --, therefor.

In column 8, line 7, in Table 1, delete "$5_\delta\alpha$]" and insert -- $5_\alpha$] --, therefor.

In column 8, line 13, in Table 1, delete "3, 5 dihydroxy," and insert -- 3,5-dihydroxy, --, therefor.

In column 8, line 16, in Table 1, delete "3,5 dihydroxy," and insert -- 3,5-dihydroxy, --, therefor.

In column 8, line 18, in Table 1, delete "$2_\beta 3_\alpha$," and insert -- $2_\beta,3_\alpha$ --, therefor.

In column 9, lines 3-4, delete "preferably." and insert -- preferably --, therefor.

In column 10, line 2, delete "betain," and insert -- betaine, --, therefor.


In the Claims

In column 14, line 8, in claim 10, delete "tropically" and insert -- topically --, therefor.